CITY NATIONAL BANK OF DETROIT v WESTLAND TOWERS
APARTMENTS

IN THE MATTER OF THE ATTORNEY FEES OF JEROME
GROPMAN

Docket Nos. 49247, 49955. Submitted January 15, 1981, at Detroit.—
Decided June 16, 1981. Leave to appeal applied for.

William B. Risman and others and Charles Granader and others
formed Westland Towers Apartments, a copartnership, for the
purpose of constructing an apartment project. As part of the
financing of that project, the partnership secured from the City
National Bank of Detroit an irrevocable letter of credit in the
amount of $250,947. This letter of credit was placed in the
hands of the mortgagee, J. M. Prentice Mortgage Company, in
accordance with the security requirements specified by the
insurer of the mortgage, the Federal Housing Administration.
When the completion date of the project was delayed, William
Risman, one of the managing partners, sought an extension of
the expiration date of the letter of credit. City National Bank
agreed to extend the letter of credit; however, the Granader
group refused to ratify the extension. William Risman thereaf-
ter executed the amendment to the letter of credit on behalf of
the partnership. The letter of credit was subsequently trans-
ferred to Government National Mortgage Association which
issued two sight drafts against the letter of credit. City Na-
tional sought reimbursement for the letter of credit, but both
the partnership and the individual partners refused to make
such reimbursement. The bank brought an action in Oakland

---

REFERENCES FOR POINTS IN HEADNOTES

[1-3] 50 Am Jur 2d, Letters of Credit, and Credit Cards §§ 8, 10.
  Construction and effect of UCC Art 5, dealing with letters of credit.
    35 ALR 3d 1404.
[4] 59 Am Jur 2d, Partnership §§ 37, 38.
[5] 60 Am Jur 2d, Partnership § 135.
[6] 59 Am Jur 2d, Partnership §§ 67, 68.
[7, 8] 59 Am Jur 2d, Partnership §§ 70, 71.
  28 Am Jur 2d, Estoppel and Waiver §§ 44, 45.
[9] 66 Am Jur 2d, Restitution and Implied Contracts § 3 et seq.
[10-12] 5 Am Jur 2d, Arbitration and Award §§ 90, 139.

Circuit Court against the partnership, the individual partners and the spouses of the partners seeking reimbursement on the letter of credit. James S. Thorburn, J., on stipulated facts, granted defendants' motion for summary judgment. Plaintiff appealed. The Court of Appeals, in an unpublished opinion, remanded to the trial court for additional findings of fact. Docket No. 78-3628, decided September 12, 1979. On remand, the trial court issued an amended opinion and again entered judgment in favor of defendants.

Jerome Gropman, attorney for the Granaders, filed a motion seeking $9,020.70 in attorney fees beyond that which he had already been paid. Upon stipulation of the parties, the trial court ordered arbitration to determine the "reasonable value of fees due Jerome C. Gropman for legal services". Prior to arbitration, the Granaders moved to set aside the order to arbitrate, which was denied. The arbitrator awarded Gropman an additional $33,000 in fees. The Granaders moved to vacate the award on the basis that the arbitrator exceeded his authority. The motion was denied and judgment was entered in the amount of $33,000 plus costs.

Plaintiff appeals from the judgment in favor of defendants. The Granaders appeal from the judgment on the arbitrator's award. *Held:*

1. While the extension of the expiration date of the letter of credit in question did not need to be in writing to be binding and, under these circumstances, was an act in the usual course of business as that term is used in the Uniform Commercial Code, the language of the partnership agreement did not permit William Risman alone to bind the partnership to the extension. Since the bank knew that William Risman's authority to execute the extension was unclear, it acted in bad faith in proceeding to extend the date of expiration under such circumstances. Such acts constituted "knowledge of the facts" within the meaning of the Uniform Partnership Act.

2. The doctrine of partnership by estoppel as contained in the Uniform Partnership Act has no application under these circumstances, since it applies only to a nonpartner representing himself as a member of a partnership.

3. The general doctrine of equitable estoppel has no application, since the bank did not rely upon facts represented by any partnership member relative to William Risman's authority to execute the extension on the part of the partnership.

4. The bank is not entitled to an implied contract based upon

the theory of unjust enrichment, since its injury was the result of its own negligence and the controlling equities were not in its favor.

5. The arbitrator's award exceeded the arbitrator's authority, since the parties clearly intended the amount alleged to be due as being the maximum amount of any award of attorney fees. The trial court, accordingly, erred in failing to set aside the arbitrator's award.

Affirmed in part, modified in part.

V. J. Brennan, P.J., dissented from the modification of the arbitrator's award of attorney fees. He would hold that the amount set forth in the attorney's pleading did not act as a limitation on the amount of attorney fees which could be awarded, since such stated amount was in the nature of an offer of compromise made prior to submission of the issue to arbitration. He would affirm the arbitrator's award.

### Opinion of the Court

1. Banks and Banking — Letters of Credit — Uniform Commercial Code — Statutes.

   A request for a renewal of credit or for an extension of the expiration date of a letter of credit is a request for a modification within the meaning of the letters of credit article of the Uniform Commercial Code (MCL 440.5106[2]; MSA 19.5106[2]).

2. Banks and Banking — Letters of Credit — Uniform Commercial Code — Statutes.

   A modification of a letter of credit by the extension of its expiration date need not be in writing to be binding under the provisions of the Uniform Commercial Code (MCL 440.5106[2]; MSA 19.5106[2]).

3. Banks and Banking — Letters of Credit — Uniform Commercial Code — Words and Phrases — Statutes.

   The securing of an extension of the expiration date of a letter of credit issued as part of the financing arrangements for a construction project is an act within the usual course of business as that phrase is used in the Uniform Partnership Act (MCL 449.9[1]; MSA 20.9[1]).

4. Partnership — Contracts — Judicial Construction.

   A partnership agreement is a contract, and, as such, where an ambiguity exists, the agreement should be construed to give effect to all its provisions if possible.

5. Partnership — Uniform Partnership Act — Words and Phrases — Statutes.

The phrase "knowledge of a fact" as used in the Uniform Partnership Act includes not only actual knowledge of a fact but also knowledge of such other facts as in the circumstances shows bad faith (MCL 449.3; MSA 20.3).

6. Estoppel — Partnership — Uniform Partnership Act — Statutes.

The partner by estoppel provisions of the Uniform Partnership Act have application only to situations where a nonpartner represents himself as the member of a partnership (MCL 449.16; MSA 20.16).

7. Estoppel — Proofs.

Equitable estoppel can be established where a party, by representations, admissions or silence, intentionally or negligently induces another party to believe facts, and the other party justifiably relies and acts on this belief and will be prejudiced if the first party is permitted to deny the existence of the facts.

8. Estoppel — Mutual Mistake — Equity.

A principal cannot be bound on an estoppel theory where there exists a mutual mistake of law as to the authority of the principal and all the material facts are known to all the parties to a transaction.

9. Contracts — Unjust Enrichment.

A contract should be implied in law in order to avoid unjust enrichment where the controlling equities favor the party claiming to have been injured and where such party's injury is not a result of that party's own negligence or misconduct.

10. Arbitration — Arbitrator's Authority.

The parameters of an arbitrator's authority are fixed by the agreement of the parties submitting a matter to arbitration.

11. Arbitration — Arbitrator's Authority — Attorney Fees.

An arbitration agreement whereby the arbitrator is to determine the "reasonable value of fees due" to an attorney limits the maximum amount of the award to the amount alleged to be due irrespective of the fact that greater fees might be found to be reasonable under the circumstances.

DISSENT BY V. J. BRENNAN, P.J.

12. ARBITRATION — ARBITRATOR'S AUTHORITY — SETTLEMENT — COM-
PROMISE.

   An arbitrator authorized to determine the "reasonable value of
   fees due" to an attorney is not limited to the amount of fees set
   forth in an offer of compromise made before the issue was
   submitted to arbitration.

*Jaffe, Snider, Raitt & Heuer* (by *Brian G. Shannon* and *Jeffrey G. Heuer),* for plaintiff.

*Bayer, Goren, Gornbein, Gropman & Kaplan, P.C.,* for Westland Towers Apartments (by *Jerome Gropman),* and for Jerome Gropman (by *Thomas W. Broakover).*

*Tucker, Barbour & Mack, P.C.,* for defendants Risman and Horace.

*Odette & Prendeville,* for defendants Granader.

Before: V. J. BRENNAN, P.J., and BRONSON and BASHARA, JJ.

BRONSON, J. Plaintiff, City National Bank of Detroit (CNB), issued an irrevocable letter of credit to defendant partnership, Westland Towers Apartments, in the amount of $250,947. When the partnership refused to pay back this amount, plaintiff instituted suit against the partnership, the partners, and the partners' wives. Plaintiff contended that the partners and their wives were liable on personal guarantees. In an order issued by the Oakland County Circuit Court on July 29, 1978, summary judgment was granted in favor of defendants. The court found that CNB had improperly modified and extended the due date of the letter of credit on the signature of one partner who did not have authority to enter into the transaction without the consent of other partners. Plaintiff appealed that order. In an unpublished opinion re-

leased September 12, 1979, this Court remanded for additional findings of fact concerning a number of issues in controversy. The trial court issued an amended opinion and order, still denying plaintiff recovery. CNB appeals from this opinion and order as of right in docket number 49247.

Docket number 49955 involves a suit by the Granaders' and Westland Tower's attorney, Jerome Gropman, for payment of attorney fees arising out of his efforts on their behalf in the letter of credit controversy. This matter was submitted to arbitration, and the reasonable value of Gropman's services was assessed at $100,000. Some payments had already been made, and the Granaders and Westland Towers Apartments were ordered to pay an additional $33,000 by the arbitrator. On January 30, 1980, the trial court entered judgment based on the arbitration award. From this judgment, the Granaders appeal.

## Factual Background

This action arises out of the construction by Westland Towers Apartments of a low and moderate income apartment project in Westland, Michigan, financed by a mortgage insured by the Federal Housing Administration. As part of the consideration for the FHA insurance of the loan, Westland Towers was required to supply additional security. This security took the form of letters of credit issued by CNB bearing numbers DI-208 through DI-211. It is the last of these, DI-211, which is the subject matter of this litigation.

On or about November 3, 1972, Westland Towers requested that CNB issue irrevocable letter of credit DI-211. This letter was delivered to J. M. Prentice Mortgage Company (Prentice), the holder of Westland Towers' mortgage, pursuant to the

terms of an escrow agreement. Although Prentice was the mortgagee, CNB purchased a 97% participation in the loan and supplied nearly all the funds used in the project.

Construction of the project was delayed. There were problems with cost overruns and disputes between the partners. Although completion of the apartments was originally scheduled for May, 1974, the project was not substantially completed until early 1975.

At the close of the construction phase of the project, "final endorsement" was sought by the FHA. Essentially, "final endorsement" is the stage at which FHA assures itself that the project is complete and all bills have been paid or arrangements have been made for payment. William Risman, one of the managing partners, instructed Prentice to seek an extension on the expiration date of DI-211, which was originally May 3, 1975. On April 25, 1975, Prentice was advised by CNB that the extension had been approved. However, appropriate amendment was not formalized at this time.

On May 8, 1975, Horace Rogers as attorney for the partnership, Jerome Gropman on behalf of the Granaders, and Joseph Kalk, the Rismans' attorney, met with the area counsel for the Department of Housing and Urban Development and other interested persons for the purpose of final endorsement. The meeting was tension-filled, and differences between the Granaders and Rismans proved irreconcilable so Gropman left the meeting. Later that day, Gropman met with a representative of the bank and together they drafted a letter, which Gropman indicated he would advise the Granaders to sign. This letter provided that the Granaders would ratify extension of the due date on letter of

credit DI-211. However, on May 9, 1975, the Granaders through another attorney, William Liberson, demanded the release of CNB's mortgage on ten acres of property near the project site as the *quid pro quo* for delivery of the signed letter. When CNB refused, Liberson left his meeting with the CNB representatives, taking with him the letter with the Granaders' signatures crossed out.

At approximately this same time, the Rismans and their attorney were pressing to complete the closing. Due to the ambiguous position of the Granaders and the partnership agreement, CNB requested that the partnership attorney give his opinion on the authority of the managing partners to execute the documentation needed for final endorsement. Rogers gave his written opinion stating that he believed the managing partners were empowered to finalize the business deal. Thereafter, William Risman for himself and by power of attorney for Robert Risman executed the request to amend the letter of credit and a promissory note in favor of CNB in the face amount of the letter of credit. The execution was officially stated as being on behalf of the partnership. The new expiration date on DI-211 became December 1, 1977.

If final endorsement had not occurred, Prentice would have assigned the mortgage to HUD (FHA), resulting in personal liability of the partners and their wives on letters of credit DI-208 through DI-210. Moreover, assignment of the mortgage would likely have caused the loss of the project through foreclosure by HUD.

On May 27, 1975, Prentice transferred DI-211 to the Government National Mortgage Association (GNMA). GNMA issued two sight drafts against letter of credit DI-211 in the aggregate total of

$250,947. All defendants subsequently refused to reimburse CNB for the letter of credit.

Other facts will be developed in the discussion of the individual issues.

*Docket No. 49247*

I

Plaintiff first argues that William Risman had the authority to unilaterally enter into a binding agreement with it with respect to the extension of the expiration date of letter of credit DI-211. If this assertion is correct, the trial court erred in granting summary judgment.

The original letter of credit provided that expiration would occur on May 3, 1975. Oral consent to an extension was obtained by CNB from William Risman prior to this date. Plaintiff first argues that Risman's oral consent to the extension was sufficient to bind the partnership.

MCL 440.5106(2); MSA 19.5106(2) provides:

"Unless otherwise agreed once an irrevocable credit is established as regards the customer it can be modified or revoked only with the consent of the customer and once it is established as regards the beneficiary it can be modified or revoked only with his consent."

Plaintiff argues that a request for a "renewal" of credit or extension of a letter of credit's expiration date is a request for a modification calling into play MCL 440.5106(2); MSA 19.5106(2). We agree with plaintiff that MCL 440.5106(2); MSA 19.5106(2) does not require written consent signed by the customer to result in a valid and binding extension. Acceptance of this premise, however, does not dispose of the question of whether the

"customer" consented to the extension of the letter of credit. The customer here was not Risman, but the Westland Towers partnership.

CNB relies on the following provision from the Uniform Partnership Act for the proposition that irrespective of Risman's actual authority, his acts in renewing the letter of credit were nonetheless binding on the partnership:

"Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority." MCL 449.9(1); MSA 20.9(1).

Initially, we note our disagreement with the lower court on the issue of whether obtaining the extension on letter of credit DI-211 was within the usual course of business. We hold that it was. The more difficult problem with allowing CNB to rely on MCL 449.9(1); MSA 20.9(1) is caused by the last clause of this provision which would divest CNB of the right to rely on Risman's acts if it had knowledge of the fact that he had no authority to unilaterally agree to the extension of the letter of credit.

This "knowledge" proviso requires an examination of the pertinent portions of the partnership agreement of which CNB concededly was aware.

*"EXECUTION OF PARTNERSHIP CONTRACT*

"10. All contracts, agreements and other instruments to which the partnership may be a party shall be signed in the partnership name by any two of the following:

WILLIAM RISMAN, ROBERT RISMAN or DON HOR-
ACE, and CHARLES GRANADER or HARRY GRA-
NADER.

*"MANAGING PARTNERS*

"11. WILLIAM RISMAN and ROBERT RISMAN are
hereby designed as the managing PARTNERS in whom
the parties hereto vest the direct responsibility for the
management of the partnership business, including the
right and power in their sole and uncontrolled discre-
tion to:

\* \* \*

"(b) borrow money for the partnership upon such
terms and conditions as they may deem necessary in
the conduct of the partnership business, and evidence
such borrowing by the execution and delivery in the
name of and on behalf of the partnership of indebted-
ness;

\* \* \*

"Any action by the managing PARTNERS may be
taken by the consent of a majority of the managing
PARTNERS, and any checks, contracts or other instru-
ments may be executed by the managing PARTNERS
on behalf of this partnership only when signed in the
manner heretofore provided."

We have no quarrel with the lower court's con-
clusion that paragraph 10 of the partnership
agreement is properly interpreted as requiring one
signature from William or Robert Risman or Don
Horace and a second signature from Charles or
Harry Granader to result in a valid execution of a
contract on behalf of the partnership. However,
when paragraph 10 is construed with paragraph
11, an ambiguity is apparent. Paragraph 11 pro-
vides in part that William and Robert Risman
have "sole and uncontrolled" discretion to borrow
money for the partnership and to execute instru-
ments evincing any indebtedness on behalf of the
partnership. Paragraph 11 of the partnership

agreement then goes on to state that any instruments executed by the managing partners must be "signed in the manner heretofore provided". This is ostensibly a reference to the signing requirement imposed by paragraph 10. However, the signature requirement is seemingly in conflict with the "sole and uncontrolled" discretion language of paragraph 11.

A partnership agreement is a contract. Where an ambiguity exists in a contract, it is to be construed to give effect to all portions of the agreement if this is possible. *Associated Truck Lines, Inc v Baer,* 346 Mich 106, 110; 77 NW2d 384 (1956). In the case *sub judice,* the seemingly conflicting portions of paragraphs 10 and 11 can be construed consistent with each other. That is, while the partnership agreement requires one signature from each of two groups of partners, if the managing partners determine that a particular contract shall be entered into, the two general partners have no discretion to refuse to sign the applicable instrument, assuming the instrument represents a legal obligation under the law and partnership agreement. The contractual provisions in issue evince an intent on the part of the partnership: (1) to give operating control to the Rismans and (2) to make certain that the Granaders were kept fully informed of all material transactions involving partnership business. By requiring one signature from the Granaders, this purpose was sought to be effectuated. If the Granaders disagreed with a decision of the Rismans, the signature requirement gave them an opportunity to attempt to persuade them to adopt another course of action. If the Rismans attempted to enter into an illegal contract, the Granaders could refuse to give their signatures. As noted earlier, the

Rismans and Granaders were unable to work amicably together by the time the final endorsement phase of the project arrived. It is possible that the two groups were somewhat leery of each other from the beginning of the project, and this explains why the partnership agreement was drafted as it was.[1]

In the instant case, obtaining an extension of letter of credit DI-211 was undoubtedly within the scope of the authority of the managing partners pursuant to paragraph 11(b) of the partnership agreement. As such, the Granaders had no legal right to refuse to sign the consent to extend the letter of credit's expiration date. This does not necessarily mean, however, that CNB could extend the expiration date of the letter of credit on the authority of the managing partners alone. Indeed, we hold that this avenue of operation was not open to CNB if it had knowledge of the managing partners' disability to execute an instrument on their own signatures. The Granaders' wrongful refusal to sign the agreement would merely have given the Rismans a cause of action to compel the signature of one or the other of them or to obtain a court order allowing the transaction to proceed on the authority of the managing partners alone. We are not unmindful of the time constraints faced by the Rismans in this case. However, if they were unsuccessful in obtaining an expedited review of their cause so that the benefits of the project were lost, they would have had a cause of

---

[1] In view of the provisions of paragraph 10 of the partnership agreement, we reject CNB's contention that Risman could orally request an extension of letter of credit DI-211 and thereby bind the partnership. Paragraph 10 provides that any instrument to which the partnership becomes a party "shall" have two signatures. Shall denotes a mandatory action. Thus, although article 5 of the UCC does not require written consent to result in a valid and binding extension of the letter of credit, paragraph 10 of the partnership agreement did.

action against the Granaders for breach of the partnership agreement.[2]

We now turn to a discussion of whether CNB had knowledge of William Risman's lack of authority to execute the contract extending the time at which DI-211 expired. It is clear that plaintiff bank did not possess knowledge of Risman's lack of authority as the term "knowledge" is generally used. That is, from the bank's perspective, William Risman's authority was unclear. However, the term knowledge as used in the Uniform Partnership Act has a special meaning. MCL 449.3; MSA 20.3 provides:

"(1) A person has knowledge of a fact within the meaning of this act not only when he has actual knowledge thereof, but also when he has knowledge of such other facts as in the circumstances shows bad faith;

"(2) A person has notice of a fact within the meaning of this act when the person who claims the benefit of the notice:

"(a) States the fact to such person, or

"(b) Delivers through the mail, or by other means of

---

[2] The Rismans do not have any cause of action based on the Granaders' wrongful refusal to execute the extension of DI-211 at this time. Because of plaintiff's decision to extend the expiration date of the letter of credit without a Granader signature, the Rismans were not harmed by the improper refusal to sign. Additionally, CNB would have no cause of action against the Granaders based on a third-party beneficiary theory, because the partnership agreement does not evince an intent to compensate others for damages caused by a breach of this contract. See, *In re Winter's Estate,* 297 Mich 294, 301-303; 297 NW 497 (1941), *St Gabriel Parish Credit Union v Barnett Pontiac, Inc,* 16 Mich App 1, 5-6; 167 NW2d 459 (1969), *Barnett v International Tennis Corp,* 80 Mich App 396, 408-409; 263 NW2d 908 (1978). While this conclusion may seem harsh, it must not be forgotten that CNB had a copy of the partnership contract before it committed any money to the project. If CNB viewed the terms of the agreement as ambiguous or potentially disasterous for its own interests it could have declined to fund the project or insisted upon modifications of the partnership agreement. However, having decided to extend the partnership capital with full awareness of the terms of the partners' contract, CNB is bound by the terms of this agreement relative to the scope of authority of individual partners.

communication, a written statement of the fact to such person or to a proper person at his place of business or residence."

Under the definitions of knowledge appearing above, we agree with the trial court that plaintiff bank did have sufficient knowledge of Robert Risman's lack of authority so that it may not claim the benefits of MCL 449.9(1); MSA 20.9(1).

CNB engaged in a course of conduct evincing bad faith and tending to show that it at least doubted William Risman's authority to extend the expiration date of the letter of credit on May 9, 1975, six days after DI-211 had originally expired. Plaintiff bank apparently believed that its legal position would be enhanced if Risman had merely "renewed" the letter of credit prior to its expiration, as opposed to having entered a new contract for its extension after expiration. Consequently, CNB had William Risman sign a request for an extension of DI-211 in the amount of $250,947 on May 9, 1975, but dated May 3, 1975, along with an undated promissory note. During discovery, the backdating was not forthrightly brought to defendants' attention. Rather, counsel for Westland Towers ultimately ferreted out this fact through his own perseverance. The "other facts" showing bad faith within the meaning of MCL 449.9(1); MSA 20.9(1), then, were acts actually committed by CNB.

In addition, MCL 449.3(2); MSA 20.3(2) precludes CNB from claiming a lack of knowledge of William Risman's authority. CNB had a copy of the partnership agreement, and its own actions clearly reveal that it doubted Risman's authority under this contract. More importantly, CNB was aware that the Granaders considered one of their signa-

tures imperative for the execution of any valid instrument on behalf of the partnership.

Since we conclude that the partnership agreement did not allow any instrument or contract to be entered into without one signature from the Risman group and one signature from a Granader, and since we conclude that CNB had knowledge of this requirement so that CNB cannot recover on the letter of credit, we do not address the validity of the power of attorney executed by Robert Risman on behalf of William Risman.

II

Plaintiff next argues that if Westland Towers is not liable for the letter of credit, then William Risman, Robert Risman, and Donald Horace are. CNB contends MCL 449.16(1); MSA 20.16(1), concerning partners by estoppel, is dispositive of this issue. Defendants deny that MCL 449.16(1); MSA 20.16(1) has any applicability to this case, contending that the provision applies only to persons representing themselves as members of a partnership when, in fact, they are not members.

Plaintiff refers us to no cases which would indicate that the statutory provisions concerning partnership by estoppel apply in this cause and we find no cases supporting this proposition. It seems clear to us that MCL 449.16; MSA 20.16 only applies to a nonpartner representing himself as a member of a partnership. See, 18 Michigan Law & Practice, Partnership, § 3, pp 323-324, in which the commentary on MCL 449.16; MSA 20.16 assumes that this section is only germane where there is not a partnership in fact.

Although MCL 449.16; MSA 20.16 is not material to the resolution of this issue, the three part-

ners in issue might be estopped from denying liability for letter of credit DI-211 under the general doctrine of equitable estoppel. To establish equitable estoppel CNB must prove that defendants by their words, conduct or inaction induced it to believe certain facts, that it justifiably relied on the existence of these facts and acted on a belief that the facts were as represented, and would be prejudiced if defendants were allowed to deny the existence of these facts. *American Electrical Steel Co v Scarpace,* 399 Mich 306, 308; 249 NW2d 70 (1976), *Conel Development, Inc v River Rouge Savings Bank,* 84 Mich App 415, 422-423; 269 NW2d 621 (1978), *lv den* 406 Mich 910 (1979).

While there is no doubt that CNB will be prejudiced if it cannot recover on the letter of credit, none of the other elements of estoppel are present. Defendants did not induce CNB to believe that William Risman had authority to bind the partnership on his signature alone. Plaintiff bank came to this conclusion after consulting the attorney for Westland Towers, not Risman's personal attorney. CNB had the partnership agreement in its possession at all times. The bank knew of the signing requirement and acknowledged its existence by negotiating with the Granaders to get a signature. When this failed, CNB attempted to circumvent the partnership agreement on this requirement. Until the dispute over the extension of letter of credit DI-211, all partners' conduct impliedly recognized that Risman alone or in conjunction with his brother and/or Donald Horace could not bind the partnership. The record indicates that William Risman was just as uncertain as the bank as to the scope of his authority to act alone or in combination with his brother, Robert. Where all material facts are known to all the

parties to a transaction, and there exists a mutual mistake of law as to the authority of the principal, said principal cannot be bound on an estoppel theory. *Annis v Pfeiffer,* 278 Mich 692, 696; 271 NW 568 (1937), *Cudahy Brothers Co v West Michigan Dock & Market Corp,* 285 Mich 18, 26; 280 NW 93 (1938). Since CNB was not induced by the defendants Risman and Horace to believe that a certain set of facts existed, there was no reliance on their words or conduct. Where there is no reliance, there can be no estoppel. *AAMCO Automatic Transmissions, Inc v Motor Trans, Inc,* 45 Mich App 539, 547; 207 NW2d 156 (1973), *lv den* 389 Mich 817 (1973).

On the stipulated facts, there was no genuine issue as to any material fact. On the facts as agreed to by the parties, defendants were entitled to a judgment as a matter of law. GCR 1963, 117.2(3).

## III

Plaintiff lastly contends that it should be allowed to recover on a theory of unjust enrichment. A contract implied in law or quasi-contract does not require a meeting of minds but is imposed by fiction of law to avoid unjust enrichment. *Cascaden v Magryta,* 247 Mich 267, 270; 225 NW 511 (1929), *City of Auburn v Brown,* 60 Mich App 258, 263; 230 NW2d 385 (1975).

The question which we must resolve, then, is whether there was unjust enrichment of the individual partners and the partnership. To support an action on this theory, the controlling equities must favor the party claiming to have been injured. *Maryland Casualty Co v H A Moss & Son, Inc,* 276 Mich 219, 230; 267 NW 819 (1936). *Maryland Casualty Co* also indicates that generally the

injured party's negligence or misconduct will bar recovery on a quasi-contractual theory. This proposition is in accordance with commentary appearing in the Restatement Restitution, § 15, p 62, which states that the party claiming injury is not entitled to restitution where he was aware of all the facts at the time he extended the benefit. The trial court found that the "plaintiff bank assumed the risk of loss" because of its knowledge of the partnership agreement before it extended the expiration date of the letter of credit. We agree. CNB would have us believe that out of the goodness of its corporate offices it allowed the letter of credit to be extended to save the partnership from certain ruin. The reality is something else again. Plaintiff bank's decision to extend the letter of credit was apparently motivated by its own self-interest. Without the extension of the letter of credit, CNB was certain to suffer financial losses. It would have had to assign the loan to FHA or begin foreclosure proceedings at a time when Westland Towers was experiencing a 50% occupancy rate. CNB gambled that its decision to extend the letter of credit on William Risman's authority would be held to bind the partnership. Now, on appeal, as an alternative theory of recovery, the bank argues that if the partnership was not bound, it nonetheless must be allowed to recover to avoid unjust enrichment of defendants. However, we see no injustice to CNB by refusing to allow recovery on this theory where it is clear that CNB was running a calculated risk in extending the expiration date of the letter of credit. Incredibly, at the point at which CNB decided to go ahead with the extension it never sought assurances from its own counsel on the likely legal effect of this course of action. This could properly be deemed negligent conduct and, in conjunction

with the underlying motivation of the bank in extending the due date of the letter of credit, the equities do not support the conclusion that CNB must be reimbursed.[3]

From the stipulated facts, the trial court correctly concluded that CNB was not entitled to the relief requested. GCR 1963, 117.2(3).

## Docket No. 49955

This appeal concerns a fee dispute arising between the Granaders and their onetime attorney, Jerome Gropman, for work completed in connection with the Westland Towers controversy. On October 10, 1979, Gropman filed a motion seeking $9,020.70 in attorney fees beyond what he had already been paid. The Granaders denied Gropman was their attorney. At this time, this sum was held in escrow by Lawrence Stockler in accordance with the agreement of the parties, pending arbitration as agreed to by the parties. The parties had intended the Detroit Bar Association to adjudicate the matter. However, they later found out that the association had no mechanism for resolving such disputes. Thus, upon stipulation of the parties, the trial court ordered arbitration to de-

---

[3] CNB also comes to this Court with unclean hands such that the lower court would be entitled to grant summary relief. The clean hands maxim has been held to be an integral aspect of any action based in equity. *Stachnik v Winkel,* 394 Mich 375, 382; 230 NW2d 529 (1975). As noted in part II of this opinion, CNB actually had William Risman backdate documents to enhance its legal position. Then, during the discovery stage of this cause, the bank was less than forthright about bringing this fact to the attention of defendants. Plaintiff's actions cast serious aspersions on its contention that it believed William Risman, with his brother's power of attorney, had the authority to extend the letter of credit after its expiration date. While CNB's known actions only directly affect certain of the legal issues raised on appeal, its willingness to engage in deceptive practices in this transaction is apparent, and it may be that other undetected deceptions were engaged in by the bank.

termine the "reasonable value of fees due Jerome C. Gropman for legal services". Prior to arbitration, the Granaders moved to set aside the order to arbitrate. This order was denied.

On November 7, 1979, the arbitrator ruled in Gropman's favor. He was awarded an additional $33,000 in fees. On December 4, 1979, the Granaders moved to vacate the award, contending the arbitrator had exceeded the scope of his authority. On January 30, 1980, the motion was denied and judgment was entered in the amount of $33,000 along with costs of $1,150 and interest.

The Granaders raise three issues on appeal. However, only the claim that the arbitrator exceeded the authority granted him by the order of arbitration and related matters merits discussion.

GCR 1963, 769.9(1)(c) empowers the court to set aside an arbitration award where the arbitrator has exceeded his authority. The agreement of arbitration entered into between the parties sets the parameters of the arbitrator's authority. *Stowe v Mutual Home Builders Corp,* 252 Mich 492, 497; 233 NW 391 (1930), *Waterford Ass'n of Educational Secretaries v Waterford School Dist,* 95 Mich App 107, 110; 290 NW2d 97 (1980), *lv den* 408 Mich 955 (1980).

The Granaders argue that the arbitrator exceeded his authority when he awarded Mr. Gropman more than the $9,020.70 being held in escrow by Stockler. This is arguable and could be resolved either way. The arbitration order refers to fees *due* Gropman for legal services associated with this matter prior to September 26, 1979. The due balances which Gropman had submitted to the Granaders in two billings he sent to them in September, 1979, requested payment in the combined amount of $9,020.70. The use of the term "due"

could be construed as limiting the scope of the arbitrator to amounts actually billed. On the other hand, other language in the order of arbitration seems to extend to the arbitrator broad power to award any amount for attorney fees which it deemed reasonable.

We find it unnecessary to determine which interpretation of the contract to arbitrate is the more reasonable.[4] We are convinced that even if the contract had not used the term "due", the arbitrator's award would have to be reduced because it is obvious that—regardless of the literal words of the contract—the parties intended that the scope of the arbitration extend only to the $9,020.70. If the contract literally gave the arbitrator the power to grant more than that sum as an attorney fee award, then it must be reformed due to a mutual mistake of the parties. See *Baas v Zinke,* 218 Mich 552, 554-555; 188 NW 512 (1922), *City of Warren v Maccabees Mutual Life Ins Co,* 83 Mich App 310, 314-315; 268 NW2d 390 (1978), *lv den* 405 Mich 845 (1979). It is clear to this Court from the oral arguments that both sides in this dispute were surprised by the arbitrator's decision to award $33,000. To effectuate the true intentions of the parties, we reduce the attorney fee award to $9,020.70, which is the maximum sum the parties intended to be awarded to Mr. Gropman. There is no need to remand this case for further proceedings since it is obvious that if the arbitrator believed $33,000 was the reasonable value of Gropman's services, he would award the maximum allowable fee of $9,020.70. The costs awarded Gropman in the amount of $1,150 remain undis-

---

[4] Although an order of arbitration was entered by the trial court, it was upon stipulation of the order's content as to both form and substance by all parties. As such, the arbitration order really represents a contract to arbitrate.

turbed. Interest is to be computed on the reduced sum.

Docket No. 49247 is affirmed and defendants may tax costs. Docket No. 49955 is affirmed as modified with no costs, neither party having prevailed in full.

Bashara, J., concurred.

V. J. Brennan, P.J. *(dissenting)*. I respectfully dissent from the holding in docket number 49955 and would award the attorney fees which the arbitrator assessed as the "reasonable value" of the attorney's services.

In any dispute regarding costs or fees, the amounts submitted for settlement are usually figures for which the parties are willing to settle without the necessity of litigation or extended hassle. The figures usually represent amounts for less than the party thinks actually is owing. In short, they represent an offer of compromise.

However, once either party decides to reject the compromised settlement offer, and actual litigation becomes necessary to resolve the dispute, these settlement figures cease to be the guidelines for determination of the actual dispute. The trier must now look to the actual value of the services to determine the disputed fee.

"The reason for the rule is that the law is said to favor peaceful settlements and that to admit unaccepted offers of compromise or ineffective attempts to reach a settlement would reach quite the opposite result and serve to encourage legal war rather than peace in the settlement of claims already in or headed for litigation. Thus the above source [5 Callaghan's Michigan Pleading & Practice, § 36.507] indicates that evidence of a compromise or settlement offer may not be received * * * as an admission of a disputed fact."

*Thirlby v Mandeloff,* 352 Mich 501, 505; 90 NW2d 476 (1958).

My perusal of the record persuades me that this is. applicable to the instant case. Upon going to actual arbitration, the earlier figure was rendered nugatory. Instead, the arbitrator was ordered to act "for the purpose of determining the reasonable value of fees due". The order provided further that "* * * the Arbitrator shall make his determination of the reasonable value of the legal services based on the arbitrator's knowledge and experience of these and similar matters".

Based upon persuasive, competent and undisputed evidence, the arbitrator determined, and the trial court upheld, the reasonable value of the services in setting the disputed attorney's fees. I would affirm the arbitrator's award of fees herein.