**NAPH–SOL REFINING COMPANY,**
Plaintiff,

v.

**MURPHY OIL CORPORATION,**
Defendant.

No. G79–14 CA6.

United States District Court,
W.D. Michigan, S.D.

Sept. 17, 1982.

On Motion for Summary Judgment
Oct. 1, 1982.

John E. Varnum, Batzell, Nunn & Bode, Washington, D.C., Foster D. Potter, O'Toole, Stevens, Johnson, Knowlton, Potter & Rolf, Muskegon, Mich., for plaintiff.

William K. Holmes, Warner, Norcross & Judd, Grand Rapids, Mich., R. Bruce McLean, Akin, Gump, Hauer & Feld, Washington, D.C., for defendant.

## OPINION

HILLMAN, District Judge.

Plaintiff Naph-Sol Refining Co. has brought this action against defendant Murphy Oil Corporation to recover alleged overcharges with respect to purchases of certain petroleum products. Plaintiff's eight-count[1] complaint and jury demand claims that defendant Murphy Oil sold plaintiff petroleum products at prices in excess of those permitted by regulations promulgated pursuant to the Economic Stabilization Act of 1970 and its amendments, 12 U.S.C.A. § 1904, and the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. § 751 et seq., 6 C.F.R. Part 150, Subpart L (1973); 10 C.F.R. Parts 210, 211, 212 (1974). Plaintiff also claims that the prices charged by defendant were in breach of supply contracts existing between the parties. Plaintiff seeks to recover, among other things, alleged overcharges, compensatory damages, treble damages, and attorney fees.

Currently before the court are defendant's motions for partial summary judgment under Rule 56(b) of the Federal Rules of Civil Procedure on Counts I, II, III and IV, and motions to dismiss Counts VII and VIII under Rule 12(b).[2] Defendant has also moved, pursuant to Fed.R.Civ.P. 39(a)(2), to strike plaintiff's demand for jury on the grounds that no right to a jury trial exists under section 210(b)[3] of the Economic Stabilization Act.

## I.

## STATEMENT OF THE CASE

Plaintiff Naph-Sol Refining Co., located in Muskegon, Michigan, is a non-branded independent marketer of petroleum products. Defendant Murphy Oil of El Dorado, Arkansas, is a refiner of petroleum products. On December 7, 1970, the parties entered into two supply contracts for the purchase of motor gasoline and fuel oils. One contract governed purchases of petroleum products by Naph-Sol from Murphy's terminal at Ferrysburg, Michigan. The second contract governed purchases by Naph-Sol from Murphy's terminal at Marquette, Michigan. Both agreements were to remain in effect from April 1, 1971 to March 31, 1973, and thereafter from year to year; provided that either party could terminate the agreement by giving written notice at least thirty days prior to March 31 of any year.

---

1. Both parties refer to plaintiff's causes of action as "Counts." For the purposes of this opinion, the court adopts the parties' use of the term "Count."

2. Plaintiff has filed a letter of nonopposition to defendant's motions for summary judgment on Count II and on defendant's first motion for summary judgment on Count III. Therefore, summary judgment will be granted on those counts.

3. Section 210 of the Economic Stabilization Act provides:

"§ 210. Suits for damages or other relief
(a) Any person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief, including an action for a declaratory judgment, writ of injunction (subject to the limitations in section 311), and/or damages.
(b) In any action brought under subsection (a) against any person renting property or selling goods or services who is found to have overcharged the plaintiff, the court may, in its discretion, award the plaintiff reasonable attorney's fees and costs, plus whichever of the following sums is greater:
(1) an amount not more than three times the amount of the overcharge upon which the action is based, or
(2) not less than $100 or more than $1,000; except that in any case where the defendant establishes that the overcharge was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error the liability of the defendant shall be limited to the amount of the overcharge: Provided, That where the overcharge is not willful within the meaning of section 208(a) of this title, no action for an overcharge may be brought by or on behalf of any person unless such person has first presented to the seller or renter a bona fide claim for refund of the overcharge and has not received repayment of such overcharge within ninety days from the date of the presentation of such claim."

The Marquette Contract required Naph-Sol to purchase a minimum of one million gallons of gasoline and one-half million gallons of fuel oil. Murphy agreed to supply up to a maximum of three million gallons of gasoline and two million gallons of fuel oil.

The Ferrysburg Contract required Naph-Sol to purchase a minimum of seven million, five hundred thousand gallons of gasoline and a minimum of twelve million gallons of fuel oils. The Ferrysburg Contract established a maximum of ten million gallons of gasoline and fifteen million gallons of fuel oils.

Under the supply agreements, Murphy agreed to sell petroleum products at prices determined by reference to "Platts Chicago Postings" plus .25 cents per gallon at Marquette, and minus .25 cents per gallon at Ferrysburg. Both supply contracts provided that prices were to escalate with "Platts Chicago Postings."

In addition to the above provisions, both supply contracts provided that the agreements were subject to specified minimum and maximum prices. Furthermore, both contracts contained the following price adjustment provision:

"*Price Adjustment.* MURPHY reserves the right at any time during the period of this agreement to increase or decrease the agreement price provided for herein. In the event any such increase or decrease in price is unacceptable to Purchaser, Purchaser shall have the right to cancel the agreement on written notice insofar as the particular product or products involved are concerned, said cancellation to be effective at the time stated in said notice. On the failure of Purchaser to exercise this right of cancellation, the increase or decrease in prices shall become automatically effective."

From August 19, 1973 to January 28, 1981, supply agreements for petroleum products were governed by various federal regulations. These regulations established among other things, the maximum allowable price which a supplier could charge for his products. At all times relevant to the present action the transactions between the instant parties were governed by these regulations.

Until early 1973, Murphy supplied plaintiff Naph-Sol with petroleum products pursuant to the two supply contracts. On or shortly before May 15, 1973, defendant Murphy Oil began to charge plaintiff Naph-Sol prices which were based on Murphy's prevailing terminal wholesale postings ("rack prices") rather than charging the prices stated within the supply contracts. Naph-Sol accepted the fuel shipments and paid the rack price charged by defendant Murphy Oil.

Plaintiff Naph-Sol purchased petroleum products from Murphy Oil at least until the filing of the instant complaint. In June of 1978, Naph-Sol filed a claim for a refund with Murphy Oil based on Naph-Sol's estimates of overcharges of 2.5 cents per gallon on the quantity of petroleum products that Naph-Sol purchased from Murphy Oil. On January 9, 1979, plaintiff filed the instant complaint alleging that defendant Murphy Oil had used an improper May 15, 1973, base price in computing allowable prices during the entire regulatory period. On March 21, 1982, defendant Murphy Oil moved for partial summary judgment on Counts I, II, III, IV and VII of plaintiff's complaint. The parties and the Department of Energy[4] have submitted extensive briefs on the pending motions.

## II.

## STANDARD FOR SUMMARY JUDGMENT

On a motion for summary judgment, the movant has the burden of showing conclusively that there exists no genuine issue as to material fact and that the moving party is entitled to summary judgment as a mat-

**4.** The Department of Energy, with permission of the court, has submitted briefs as amicus curiae on Counts III and IV of plaintiff's complaint. The applicable regulations were administered by the Federal Energy Office, the Federal Energy Administration and the Department of Energy. These Agencies will be referred to as DOE.

ter of law. *Smith v. Hudson,* 600 F.2d 60 (6th Cir.1979); *Tee-Pak, Inc. v. St. Regis Paper Co.,* 491 F.2d 1193 (6th Cir.1974).

 In determining whether there are issues of fact requiring a trial, "the inferences to be drawn from the underlying facts contained in [the affidavits, attached exhibits and depositions] must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). *Accord, Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425 (6th Cir.1962). Even if the basic facts are not disputed, summary judgment may be inappropriate when contradictory inferences may be drawn from them. *Diebold, supra; EEOC v. United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industry, Local 189,* 427 F.2d 1091, 1093 (6th Cir.1970). In making this determination, the court must make reference to the entire record and all well-pleaded allegations are to be accepted as true. *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389 (6th Cir.1975). These guidelines will be adhered to as substantive issues of the various motions are examined.

On August 16, 1982, a hearing on defendant's motions was held before this court. For the reasons that follow, defendant's motions are granted in part and denied in part.

## III.

### COUNT I OF THE COMPLAINT

Count I of plaintiff's complaint alleges that Murphy Oil violated the Mandatory Petroleum Price Regulations, 10 C.F.R. Part 212 (1975) (Price Regulations),[5] by exceeding the maximum allowable price which Murphy Oil could charge under the regulations. The rule for determining a refiner's maximum allowable price was as follows:

"A refiner may not charge to any class of purchaser a price in excess of the base

price of that covered product except to the extent permitted pursuant to the provisions of paragraphs (c) and (d) of this section."

10 C.F.R. § 212.82(a) (1975).

The base price from which a refiner calculated the maximum allowable price under the regulations was defined as follows:

"The base price for sales of an item by a refiner is the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973 . . . ."

10 C.F.R. § 212.82(b)(1) (1975).

The critical issue in Count I of plaintiff's complaint is the appropriate May 15, 1973, "base price" from which Murphy Oil should have determined its maximum allowable price for sales of petroleum products to plaintiff Naph-Sol. Naph-Sol alleges that, under the Price Regulations, the proper base price between the parties should have been determined by reference to the minimum and maximum price schedules listed within the supply contracts rather than by reference to the actual rack price charged by Murphy Oil in sales to Naph-Sol on or shortly before May 15, 1973.

Naph-Sol contends that as of May 15, 1973, the supply contracts between the parties were in effect. Naph-Sol alleges that the price schedules contained in the supply contracts constituted the "lawful" base price between the parties on May 15, 1973, on which to calculate the maximum allowable price under the Price Regulations. 10 C.F.R. § 212.82(a). Naph-Sol contends that in calculating the maximum allowable price based on the higher rack price actually charged Naph-Sol, defendant Murphy Oil used an incorrect (illegal) base price during the entire regulatory period. Thus, under plaintiff's theory, Murphy Oil's breach of contract violated the price regulations. Consequently, Naph-Sol seeks to recover alleged overcharges pursuant to section 210(b) of the Economic Stabilization Act. 12 U.S.C. § 1904 (note).

---

**5.** The Price Regulations were originally adopted by the Cost of Living Council on August 17, 1973, 6 C.F.R. § 150.355, 38 Fed.Reg. 22536 (August 22, 1973). The regulations were adopted without relevant changes by the Federal Energy Office on January 15, 1974. 10 C.F.R. § 212, 39 Fed.Reg. 1955 (Jan. 15, 1974).

On the other hand, Murphy Oil's motion for summary judgment rests on five grounds. First, Murphy Oil contends that the supply contracts between the parties had been terminated orally and by written notice prior to May 15, 1973. Second, Murphy Oil contends that plaintiff's claim is barred by the applicable statute of limitations. Third, Murphy contends that even if the contract had not been properly terminated, Murphy's prices charged on May 15, 1973, were permitted by the terms of the contracts and consequently, that its prices on May 15, 1973, were lawfully priced within the meaning of 10 C.F.R. § 212.82(b)(1) (1975). Fourth, Murphy claims that the phrase "lawfully priced" as contained in the price regulations, 10 C.F.R. § 212.82(b)(1) (1975), does not incorporate private contractual agreements. Thus, Murphy claims, even if the contracts were not properly terminated, Murphy's prices on May 15, 1973, were not unlawful under the price regulations. Fifth, Murphy claims Count I of plaintiff's complaint is barred by laches.

### A. Contract Termination.

In support of defendant's motion for summary judgment, defendant Murphy Oil has submitted a number of communications and depositions which defendant alleges establish that the contracts were terminated. On January 5, 1973, Naph-Sol's vice president and officer in charge of procurement, Roy Weerstra, wrote to Michigan United States Senator Robert P. Griffin requesting that Oil Import Regulations be amended and also informing Senator Griffin that 30% of Naph-Sol's supply had already been cancelled by "the majors." In addition, Mr. Weerstra informed Senator Griffin that Naph-Sol had received threats of additional cancellations as contracts expired. At his deposition, Mr. Weerstra admitted that defendant Murphy Oil was included in his reference to the majors.

Murphy Oil has also submitted Naph-Sol's January, 1973, petition to the Oil Import Appeals Board for an allocation of gasoline and a license to import gasoline. In its request for an import quota and license,

Naph-Sol stated that its petition was made in response to the cancellation of supply contracts by three oil companies. Naph-Sol specifically stated that effective April 1, 1973, Murphy Oil would no longer supply Naph-Sol with the 12,000,000 gallons of gasoline that Murphy had previously supplied.

As additional proof of the termination of the contracts, Murphy Oil has submitted a January 26, 1973, letter from Murphy's regional manager James Rawlings, in which Mr. Rawlings informed Naph-Sol that Murphy Oil was not in any position to enter into any type of a supply arrangement on any product except for a small amount of petroleum product that had been verbally agreed to between the parties. Murphy contends that the series of correspondence establishes that Murphy Oil terminated the supply arrangements and that Naph-Sol clearly recognized that the agreements had been so terminated.

In opposing Murphy's motion for summary judgment, Naph-Sol contends that summary judgment is inappropriate because material issues of disputed fact exist regarding the termination of the contracts. With respect to the series of communications, Naph-Sol contends that these documents merely represent Naph-Sol's attempts to obtain additional product and reflect Naph-Sol's belief that Murphy Oil intended to terminate the supply agreements in the future. In support of its contention, Naph-Sol cites the deposition of Roy Weerstra, in which Mr. Weerstra repeatedly stressed that the stated level of supplied product in the petition to the Oil Import Appeals Board was an attempt to inform the Oil Import Appeals Board that Naph-Sol anticipated Murphy's termination of the Supply contract.

Naph-Sol contends that the Rawlings letter of January 26, 1973, did not constitute notice of termination. Rather, Naph-Sol contends that the letter of January 26, 1973, was merely a response to an earlier Naph-Sol request for gasoline in addition to the volume of petroleum product that Murphy was obligated to supply under the supply contracts. Naph-Sol contends that these

communications, among others, present material issues of disputed fact which preclude a finding of summary judgment. I agree.

■■■ On a motion for summary judgment, the movant has the burden of showing conclusively that there exists no genuine issue as to material fact and that the moving party is entitled to summary judgment as a matter of law. *Smith v. Hudson,* 600 F.2d 60 (6th Cir.1979); *Tee-Pak Inc. v. St. Regis Paper Co.,* 491 F.2d 1193 (6th Cir.1974). In the present case, plaintiff Naph-Sol has presented the court with specific evidence which refutes defendant's contention that the supply agreements were properly terminated. In reviewing all the evidence in a light most favorable to the party opposing the motion for summary judgment, *see United States v. Articles of Device, etc.,* 527 F.2d 1008, 1011 (6th Cir. 1976), I find that material issues of disputed fact remain concerning the termination of the supply agreements. Consequently, defendant's motion for summary judgment on the grounds that supply agreements were properly terminated is denied.[6]

### B. *Statute of Limitations.*

Defendant Murphy Oil additionally has moved for summary judgment on Count I of plaintiff's complaint on the ground that the Count is barred by the applicable statute of limitations. Specifically, Murphy claims that the Michigan four-year statute of limitations governing breach of contract actions, M.C.L.A. § 440.2725(1), is applicable. Since the complaint was filed more than five years after the claim arose on May 15, 1973, Murphy alleges that the applicable four-year statutory period has lapsed.

Neither the Emergency Petroleum Allocation Act nor section 210 of the Economic Stabilization Act contains a statute of limitation. In such circumstances, a federal court must apply the most analogous state statute of limitations which is consistent with the underlying policies of the federal statute. *Ashland Oil Co. of California v. Union Oil Co. of California,* 567 F.2d 984 (TECA, 1977), *cert. denied,* 435 U.S. 994, 98 S.Ct. 1644, 56 L.Ed.2d 83 (1978). In the present case, the three Michigan statutes of limitations which are arguably applicable are as follows:

(i) *Breach of Contract.* An action for the breach of any contract for sale must be commenced within four years after the cause of action has accrued. M.C.L.A. § 440.2725(1);

(ii) *Injuries to Persons or Property.* The period of limitations is three years for all other actions to recover damages for injuries to persons and property. M.C.L.A. § 600.5805(7);

(iii) *Residual Personal Actions.* All other personal actions shall be commenced within the period of six years after the claim accrues and not afterwards unless a different period is stated in the statutes. M.C.L.A. § 600.5813.

For the reasons that follow, I find the applicable statute of limitations to be Michigan's six-year residual statute of limitations. M.C.L.A. § 600.5813.

■■ *Reiterman v. Westinghouse,* 106 Mich.App. 698, 308 N.W.2d 612 (1981), sets forth, under the Michigan law, the proper analysis to determine the applicable statute of limitations. In *Reiterman,* the Michigan Court of Appeals stated that the court should look to "the nature of damages sought rather than the form of the action plaintiff has proceeded under...." *Id.* at 705, 308 N.W.2d at 614, *quoting Rach v. Wise,* 46 Mich.App. 729, 208 N.W.2d 570 (1973). In the present case, plaintiff seeks to recover overcharges for alleged violations of the Price Regulations promulgated under the Economic Stabilization Act. Plaintiff's recovery, if any, will be premised upon a finding that Murphy Oil miscalculated the maximum allowable price under the Price Regulations. No inquiry need be made to determine whether plaintiff suf-

---

**6.** Both parties have submitted additional proofs which allegedly support the parties' respective positions. Based on the above finding that material issues of fact are in dispute regarding the termination of the contracts, I find it unnecessary to address the parties' additional proofs.

fered any injury due to defendant's actions. Rather, the court's inquiry, and plaintiff's complaint, is limited to the issue of whether defendant properly adhered to applicable federal regulations. Indeed, Count I of plaintiff's complaint does not even mention "damages." Consequently, the nature of plaintiff's claimed recovery is not based in contract; nor can plaintiff's case be characterized as a damage action. Thus, neither the Michigan statute of limitations governing contract actions, nor the statute of limitations governing damage actions is applicable to the present case.

At least one federal court has found Michigan's six-year statute of limitations to be applicable to actions brought under section 210 of the Economic Stabilization Act. In *Naph-Sol Refining Co. v. Cities Service Oil Co.,* 506 F.Supp. 77 (W.D.Mich.1980), the court held that the most analogous statute of limitations was Michigan's six-year statute of limitations. M.C.L.A. § 600.5813, *Id.* at 77. In attempting to distinguish *Cities Service,* Murphy contends that the court in *Cities Service* was faced with purely statutory violations of the Price Regulations. Murphy contends that unlike the alleged violations in *Cities Service,* the alleged violations in the present case are essentially contractual and therefore governed by Michigan's four-year statute of limitations governing contract actions. M.C.L.A. § 440.2725(1).

I find defendant's assertions to be unpersuasive. The fact that defendant's alleged violations of the Price Regulations involved contractual matters does not alter the fact that the defendant's alleged conduct was exclusively a violation of federal regulations.

Therefore, I find that Count I of plaintiff's complaint is governed by M.C.L.A. § 600.5813. Since the present action was commenced within six years of May 15, 1973, I find that Count I of plaintiff's complaint is not time-barred.

### C. *Price Terms.*

Murphy Oil has also moved for summary judgment alleging that regardless of whether or not the contracts between the parties were properly terminated, Murphy's sale price on May 15, 1973, was permitted by the contracts. Thus, Murphy contends, the actual price charged to Naph-Sol was a valid price on which to calculate the maximum allowable price under 10 C.F.R. § 212.82(b)(1) (1975).

Murphy's claim is based on the price adjustment provisions which were contained in both the Ferrysburg and Marquette supply agreements. Under the price adjustment provisions, Murphy Oil retained the right to increase or decrease the "agreement price provided for herein." The price adjustment clause further stated that in the event that any such increase or decrease was unacceptable to the purchaser, the purchaser had the right to cancel the agreement. However, under the terms of the price adjustment clause, if the purchaser failed to exercise his right of cancellation, the increase or decrease in price automatically became effective.

Murphy contends that the price adjustment clause permitted Murphy to raise its prices above those stated within the agreement. Consequently, Murphy claims that when Naph-Sol failed to exercise its right of cancellation, the prices charged on May 15, 1973, automatically became effective. Therefore, defendant contends that Murphy properly calculated its maximum allowable price under the Price Regulations based on the May 15, 1973, selling price.

In opposing Murphy's motion, Naph-Sol claims that the price adjustment clause was a standard provision contained in Murphy's form contract while the maximum and minimum prices set forth in the agreements were specifically bargained for. Naph-Sol contends that the more specific price terms must prevail over the conflicting price adjustment clause. *See, Western Oil Fields Inc. v. Penzoil United Inc.,* 421 F.2d 387 (5th Cir.1970). Consequently, Naph-Sol claims that Murphy's prices as of May 15, 1973, were in breach of contract and, therefore, illegal under the Price Regulations.

■ As a preliminary matter, I note that the interpretation of unambiguous contract terms is a matter of law for the court. *Craib v. Presbyterian Church,* 62 Mich.App. 617, 233 N.W.2d 674 (1975). Even where ambiguities exist, a contract must be construed to give effect to all portions of the agreement so not to reject any words or terms as surplusage. *Union Investment Co. v. Fidelity & Deposit Co. of Maryland,* 549 F.2d 1107 (6th Cir.1977); *City National Bank of Detroit v. Westland Towers Apartments,* 107 Mich.App. 213, 309 N.W.2d 209 (1981); *Murphy v. Seed-Roberts Agency, Inc.,* 79 Mich.App. 1, 261 N.W.2d 198 (1977). Thus, summary judgment may be appropriate even where the parties disagree as to the meaning of contract terms. *Steinmetz Electrical Contractors Association v. Local Union No. 58 AFL–CIO,* 517 F.Supp. 428 (E.D.Mich.1981).

In the present case, the terms of the contract are unambiguous. Although there may be some dispute as to the meaning of the contract language, the terms themselves are clear. Therefore, I find that the interpretation of the contract is a matter of law properly before this court on a motion for summary judgment.

■ In interpreting the contracts so as to give effect to all portions of the agreement, I find that Murphy's May 15, 1973, selling price was permissible under the supply agreements existing between the parties. Under the supply agreements, Naph-Sol was obligated to purchase a minimum amount of product while the prices charged were within the minimum and maximum price ranges stated within the agreements. Naph-Sol was required to purchase its minimum amount, and had the right to require Murphy to supply up to the maximum stated amount, so long as the price was within the state price range. Naph-Sol could be excused from meeting its minimum purchase requirements if Murphy invoked its right under the price adjustment clause by cancelling the contract. In the absence of a protest by Naph-Sol, the prices charged on May 15, 1973 automatically became effec-

tive. Therefore, both provisions of the agreement can be given a logical, reasonable effect.

In the present case, there is no dispute that the prices charged on May 15, 1973, were in excess of the price ranges stated in the supply agreements. There is also no dispute that Naph-Sol accepted fuel shipments and paid Murphy Oil prices which were higher than those stated in the supply contracts. Therefore, under the terms of the agreements, the increased prices automatically became effective. Thus, in calculating its maximum allowable price under the price regulations based on the May 15, 1973, price at which Naph-Sol purchased petroleum products, Murphy Oil used a base price which was allowed by the agreements between the parties. Therefore, Murphy Oil used a valid, lawful, base price on which to calculate its maximum allowable price under the Price Regulations. Consequently, defendant's motion for summary judgment on Count I of plaintiff's complaint is granted.

Based on the above disposition of the issues in Count I of plaintiff's complaint, I find it unnecessary to address defendant's contentions that Count I of the complaint is barred by laches and that the term "lawfully priced" as used in 10 C.F.R. § 212.-82(b)(1) (1975) does not incorporate private contractual agreements.

## IV.

### REGULATORY CHALLENGES

Defendant also challenges two particular aspects of the regulatory scheme. Defendant has moved for partial summary judgment on Count III, challenging the procedural and substantive validity of the so-called "V" factor, *see* 10 C.F.R. § 212.-83(c)(2)(iii)(c) (1981), and for summary judgment on Count IV, challenging the "deemed recovery rule," 10 C.F.R. § 212.83(h) (1981), *see* 39 Fed.Reg. 32306 (Sept. 5, 1974). The court wishes further argument on the applicability of the deemed recovery rule before

ruling on its validity. Therefore, only Count III, the "V" factor, will be discussed.

When the original Cost of Living Council regulations were adopted in 1973, all products produced from crude oil were "covered products" as defined in 6 C.F.R. § 150.352. 28 Fed.Reg. 22538 (Aug. 22, 1973). The original regulations stated that refiners could, in computing the base price for a covered product, include the amount of increased crude cost which was "attributable" to the product.[7] These regulations were soon replaced by mathematical formulas. These formulas were amended several times prior to April, 1974, when they become critical for the present purposes. As it stood at that time, the relevant part of the formula for special products (gasoline, No. 2 heating oil, No. 2 diesel fuel) stated:

$$d_i{}^u = \frac{A^t(V_i{}^u/V^n)}{V_i{}^n} + \text{other costs, where}$$

$d_i{}^u$ = the total price increase which could be added to May 15, 1973 selling price for each class of purchaser of special product "i",

$A^t$ = total increased costs of crude oil,

$V_i{}^u$ = volume of product "i" sold in same period last year,

$V^n$ = volume of all covered products sold in same period last year, and

$V_i{}^n$ = projected sales volume of product "i" in current month.

---

The $(V_i{}^u/V^n)$ term, the "V" factor, when multiplied by the total increased costs of crude, allocated those increased crude costs to each of the respective products refined from the crude, in proportion to their volumes. A similar formula for non-special products also contained a "V" factor. *See* 10 C.F.R. § 212.83(c)(2), 39 Fed.Reg. 1955 (Jan. 15, 1974). At this time all petroleum products were regulated and each bore a volumetric proportion of the crude oil costs.

In November, 1973, the EPAA was enacted into law. It did not cover certain petroleum products which had been regulated under the Economic Stabilization Act, *e.g.*, petroleum wax, petroleum coke, asphalt, and road oil. On April 3, 1974, the DOE amended the regulations to redefine "covered products" to exclude those which it no longer had the authority to regulate. 39 Fed.Reg. 12353 (Apr. 5, 1974). It did not,

however, amend its allocation formulas. This meant that all increased crude costs were passed through on "covered products" only, *i.e.*, each covered product bore more than its volumetric proportionate share. On April 30, 1974, DOE adopted an amendment without notice and comment, to change the denominator of the "V" factor from volume of all covered products to volume of all products produced from crude. 39 Fed.Reg. 15139 (May 1, 1974).

This amendment was struck down by the Temporary Emergency Court of Appeals (TECA) in *Mobil Oil Corp. v. DOE,* 610 F.2d 796 (TECA, 1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980) (*Mobil I*), *on rem,* 647 F.2d 142 (TECA, 1981) (*Mobil II*), *on rem,* 678 F.2d 1083 (TECA, 1982) (*Mobil III*). DOE promulgated the 1974 amendment without notice and comment, suggesting that an emergency existed (ex-

---

**7.** *E.g.,* for special products,

"In no case may the ratio that the attributed part bears to the total increased costs of imports exceed the ratio which sales during the corresponding fiscal quarter of the pre- ceding year of the particular product receiving this allocation bears to the total sales of covered products during the same quarter." 6 C.F.R. § 150.356(d)(1), f(1), .357(d)(1), 38 Fed.Reg. 22356, 22540, 22541 (Aug. 22, 1973).

cusing the necessity of notice and comment) because the agency's regulatory authority over the exempt products would lapse on April 30, 1974, with the expiration of the Economic Stabilization Act of 1970. DOE also failed to consider its actions in terms of meeting the various legislative objectives of the EPAA. Again, its only substantive basis was a belief that it could no longer regulate exempt products.

TECA found the rules procedurally invalid because no emergency existed, and arbitrary and capricious because they were not based on the EPAA objectives. TECA held that while the DOE could not regulate exempt products, the statutory change did not necessarily restrict the amount of costs which could be passed through on covered products. Therefore the rules would not have been in excess of the agency's legislative mandate if they had not been amended, and accordingly, no emergency existed. Furthermore, since Congress had not restricted passthrough in the manner DOE sought to restrict it by rule, DOE was required to consider its ruling in terms of the competing interests discussed in the statute. Failure to do so was arbitrary and capricious.

In *Mobil III,* TECA held that its earlier opinions in *Mobil I* and *Mobil II* did not determine the validity of the 1976 amendments. As the *Mobil III* court noted in footnote 19,

"Once adopted, administrative regulations are considered valid and enforceable until they are successfully challenged in court. That challenge has not yet been made with respect to these later regulations."

Murphy now directly challenges those later regulations.

Defendant puts forward three major arguments against the validity of the 1976 amendment: (1) that it was improperly promulgated without notice of the agency's intent to review those aspects of the regulation which in effect allocated crude oil costs to exempt products; (2) that the DOE did not consider the issue, as evidenced by the failure to discuss it in the "basis and pur-

pose" analysis which accompanied the final promulgation; and (3) that the promulgation was arbitrary and capricious because the DOE did not consider the EPAA objectives.

Subchapter II of the Administrative Procedures Act (APA), 5 U.S.C. § 551 *et seq.,* and the rule-making requirements of the Federal Energy Administration Act (FEAA), 15 U.S.C. § 766(i)(1)(B) and (C), are both applicable to the 1976 rule-making challenged by Murphy. 15 U.S.C. § 766(i)(1)(A); *Standard Oil Co. v. DOE,* 596 F.2d 1029 (TECA, 1978).

The APA requires:

"(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms and substance of the proposed rule or a description of the subjects and issues involved. . . .

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."

5 U.S.C. § 553. The FEAA requires:

"(B) Notice of any proposed rule, regulation, or order described in paragraph (A) shall be given by publication of such proposed rule, regulation, or order in the Federal Register. In each case, a minimum of ten days following such publication shall be provided for opportunity to comment; except that the requirements of this paragraph as to time of notice and

opportunity to comment may be waived where strict compliance is found to cause serious harm or injury to the public health, safety, or welfare, and such finding is set out in detail in such rule, regulation, or order. . . .

(C) In addition to the requirements of paragraph (B), if any rule, regulation, or order described in paragraph (A) is likely to have a substantial impact on the Nation's economy or large numbers of individuals or businesses, an opportunity for oral presentation of views, data, and arguments shall be afforded. To the maximum extent practicable, such opportunity shall be afforded prior to the issuance of such rule, regulation, or order, but in all cases such opportunity shall be afforded no later than forty-five days after the issuance of any such rule, regulation, or order. A transcript shall be kept of any oral presentation."

15 U.S.C. § 766(i)(1).

The APA requirements were well analyzed in *Home Box Office, Inc. v. Federal Communications Commission,* 567 F.2d 9, 35–36 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977).

"The APA sets out three procedural requirements: notice of the proposed rulemaking, an opportunity for interested persons to comment, and 'a concise general statement of [the] basis and purpose' of the rules ultimately adopted. 5 U.S.C. § 553(b)–(c). As interpreted by recent decisions of this court, these procedural requirements are intended to assist judicial review as well as to provide fair treatment for persons affected by a rule. To this end there must be an *exchange* of views, information, and criticism between interested persons and the agency. Consequently, the notice required by the APA, or information subsequently supplied to the public, must disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based. Moreover, a dialogue is a two-way street: the opportunity to comment is meaningless unless the agency responds to significant points raised by the public. A response is also

mandated by [*Citizens to Preserve*] *Overton Park* [*Inc. v. Volpe,* 401 U.S. 402 [91 S.Ct. 814, 28 L.Ed.2d 136] (1971)], which requires a reviewing court to assure itself that all relevant factors have been considered by the agency.

From this survey of the case law emerge two dominant principles. First, an agency proposing informal rulemaking has an obligation to make its views known to the public in a concrete and focused form so as to make criticism or formulation of alternatives possible. Second, the 'concise and general' statement that must accompany the rules finally promulgated

must be accommodated to the realities of judicial scrutiny, which do not contemplate that the court itself will, by a laborious examination of the record, formulate in the first instance the significant issues faced by the agency and articulate the rationale of their resolution. * * * [The record must] enable us to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did.

*Automotive Parts & Accessories Ass'n v. Boyd, supra,* 132 U.S.App.D.C. [200] at 208, 407 F.2d [330] at 338." (Citations and footnote omitted.) (Emphasis in original.)

**A. *Notice and Comment.***

Defendant first argues that it had no notice of DOE's intent to review the requirement that refiners not be allowed to assign certain crude oil costs to covered products. Defendant cites *Mobil Oil Corp. v. Federal Power Commission,* 483 F.2d 1238 (D.C.Cir.1973); *Rodway v. United States Department of Agriculture,* 514 F.2d 809 (D.C.Cir.1975); *Buckeye Power, Inc. v. Environmental Protection Agency,* 481 F.2d 162 (6th Cir.1973); and *Standard Oil Co. v. DOE,* 596 F.2d 1029 (TECA, 1978). All of the cited cases are easily distinguished. *Mobil Oil* and *Rodway* involved final regulations which were significantly different than the original notices suggested. *Buck-*

eye *Power* involved regulations on which interested parties were not given an opportunity to comment. The regulations in *Standard Oil* were adopted without prior notice.

None of these shortcomings appear in the presently challenged rule-making. The proposed rule was published in the Federal Register. Although the "V" factor was not specifically included in the proposed regulation, it was referred to on several occasions, and the "R" factor, which was specifically mentioned and described, contained terms comparable to those challenged here by Murphy. The final rule as adopted was not significantly different from the proposed rule except that it gave refiners the option of using the "V" or "R" factors.

 It cannot be said that Murphy was unaware of the proposed regulation, or that it was unaware of the DOE's interpretation of the terms of the regulation. Accordingly, the court finds that the published notice was sufficient to alert Murphy to the terms of the proposed regulation.

### B. *The Basis and Purpose Statement.*

Defendant's second argument, closely related to the first, is that DOE, as a procedural matter, failed to consider the issue now challenged. This argument is based on DOE's failure to specifically list the issue in the published notice or rule-making and the failure to discuss the issue in the "general statement of ... basis and purpose," required by 5 U.S.C. § 553(c). As discussed above, defendant was clearly on notice as to the effect of the proposed regulation, and defendant's second argument misconstrues the intent of the "basis and purpose" statement. As stated in *Rodway, supra,* 514 F.2d at 817:

> "The basis and purpose statement is *not intended to be an abstract explanation addressed to imaginary complaints.* Rather, *its purpose is,* at least in part, *to respond* in a reasoned manner *to the comments received, to explain* how the agency resolved any significant *problems raised by the comments,* and to show how that resolution led the agency to the ultimate rule." (Emphasis added.)

Defendant commented on the proposed regulations, but did not comment on the issue it now raises. *See* Comments of Murphy Oil, Attachment D, Amicus' Appendix of Attachments (Jan. 23, 1976).

Moreover, agencies need not reply to each comment received.

> "[I]t should be obvious that the Secretary need not answer each of the thousands of comments he received over a two-year period. *See Automotive Parts & Accessories Assn. v. Boyd,* 407 F.2d 330, 338 (D.D.Cir.1968). Nor does every nonfrivolous 'substantive' inquiry merit a head-on response in the agency's general statement under 5 U.S.C. § 533(c). Instead, the Secretary is obligated to identify and comment on only major issues raised during the proceeding which are central to his exercise or regulatory discretion. Judgments as to what issues are vital and material also are susceptible to review under the arbitrary and capricious standard. *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 (D.C.Cir.), *cert. denied,* 434 U.S. 829 [98 S.Ct. 111, 54 L.Ed.2d 89] (1977)."

*Community Nutrition Institute v. Bergland,* 493 F.Supp. 488, 492–493 (D.D.C.1980).

 After reviewing the comments received by DOE, the court finds that the issue did not rise to the status of a major issue requiring agency comment in the basis and purpose statement. Accordingly, the court finds that the failure to comment on the allocation of crude costs to exempt products is not fatal to the promulgation of the 1976 amendment.

### C. *Substantive Challenges.*

Defendant's third contention is that the 1976 "V" factor amendment was substantively invalid, as arbitrary and capricious, because DOE failed to consider the statutory objectives of section 4(b)(1) of the EPAA, 15 U.S.C. § 753(b)(1), and because the regulations do not allow for a dollar-for-dollar passthrough of net increases in the cost of crude oil as required by section 4(b)(2)(A), 15 U.S.C. § 753(b)(2)(A).

The standard for reviewing substantive challenges was addressed in *McCulloch Gas Processing Corp. v. DOE,* 650 F.2d 1216, 1221 (TECA, 1981), wherein the court stated:

"In summarizing the appropriate scope of review under the arbitrary and capricious standard the Supreme Court in *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974), held that a reviewing court must determine whether the decision of the agency was based on a consideration of the relevant factors, whether there was a clear error of judgment, and whether the agency has articulated a rational connection between the facts found and the choice made. The Court noted that under the arbitrary and capricious standard the scope of review is a narrow one, and while the reviewing court 'may not supply a reasoned basis for the agency's action', it should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' The *Bowman* formulation in connection with the 'rational basis' test has been followed by this court in *Texaco v. FEA,* 531 F.2d 1071, 1076–77 (Em.App.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976); *Grigsby v. DOE,* 585 F.2d 1069, 1074 (Em.App.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979); and *Mobil Oil Corporation v. DOE,* 610 F.2d 796, 801 (Em.App.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980)." (Footnote omitted.)

A review of the relevant factors includes a review of the statutory objectives contained in section 4(b) of the EPAA. *Texaco, Inc. v. FEA,* 531 F.2d 1071 (TECA), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976); *Mobil I, supra.* This review must occur prior to the promulgation of the regulation, not as a *post hoc* rationalization. *Mobil I.*

The *Mobil I* court found the 1974 amendment substantively invalid because DOE

stated in promulgating the amendment that its decision was based on the lapse of the Economic Stabilization Act of 1970, notwithstanding the EPAA requirement that the purpose of regulations be to achieve to the maximum extent possible, the nine EPAA objectives. 610 F.2d at 801–802. The DOE also admitted that it chose to adopt the volumetric allocation scheme solely because it was the only method set forth in the regulations at that time. 610 F.2d at 802.

The Energy Policy and Conservation Act (EPCA) was enacted on December 22, 1975. It directed that new regulations take effect not later than February 1, 1976. 15 U.S.C. § 758. The proposed regulations, now challenged here, were published on January 7, 1976, 41 Fed.Reg. 1680, and final regulations were adopted February 1, 1976, 41 Fed.Reg. 5111 (Feb. 4, 1976). As noted in *Air Transport Association of America v. FEO,* 520 F.2d 1339, 1341 (TECA, 1975), TECA "has repeatedly recognized the strong presumption in favor of administrative decisions by agencies charged with the administration of a new federal statute." With these standards in mind, the court turns to defendant's substantive arguments.

Defendant strenuously objects to the lack of a clear statement to the effect that the 1976 amendment resulted from a careful balancing of the nine EPAA objectives. However, the agency need not publish a laundry list indicating how each aspect of its proposed regulations furthers one or more of the specific objectives. In *Mobil I* the 1974 amendment was held invalid where an improper basis was clearly stated.[8] No such improper or irrelevant factors appear in the 1976 amendment. Moreover, the agency "must be afforded substantial leeway in attempting to attain" what are inherently inconsistent objectives contained in the EPAA. *Basin, Inc. v. FEA,* 552 F.2d 931, 935 (TECA), *cert. denied,* 434 U.S. 821, 98 S.Ct. 64, 54 L.Ed.2d 78 (1977). *Accord Amtel, Inc. v. FEA,* 536 F.2d 1378, 1383 n. 9; *Pasco, Inc. v. FEA,* 525 F.2d 1391, 1397 n. 15 (TECA, 1975).

---

**8.** *See also, Wong Wing Hang v. INS,* 360 F.2d 715, 719 (2d Cir.1966), cited by the Supreme

Court in *Overton Park,* in its original formulation of the "relevant factors" language.

More important, it appears that Congress has had the opportunity to consider the "V" factor and its impacts, and chose not to change the regulations, but rather to enact parts of them into statutory law. The EPAA did not use the term "direct proportionate distribution (by volume)" when it was originally enacted. The EPCA added the phrase in 1975, after the use of similar terms in the 1974 "V" factor amendment. Congress was fully aware of the regulatory scheme then in existence, including the "V" factor. *See* Appendix V to H.Rep. No. 94–340, 94th Cong., 1st Sess., p. 185, 190–191, reprinted in 1975 U.S.Code Cong. & Admin. News, pp. 1762, 1916, 1921–1922. Congress was also aware of the interpretation which would be given to the term "direct proportionate distribution (by volume)" when it enacted the term. Sen.Cong.Rep. No. 94–516 at 198, 94th Cong., 1st Sess., reprinted in 1975 U.S.Code Cong. & Admin.News at 2039–2040. Congress was aware of the regulatory scheme and had the opportunity to change it by amending the statute. Instead it chose to add new language specifically enacting aspects of the regulatory scheme. Such Congressional action constitutes approval of the administrative regulations. *Mobil Oil Co. v. FEA,* 566 F.2d 87, 100–101 (TECA, 1977); *Marathon Oil Co. v. FEA,* 547 F.2d 1140, 1145–1146 (TECA, 1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 378 (1977).

Even without the Congressional action, allocation of some increased product costs to exempt products was certainly rational in 1976. Review of the DOE's published remarks and industry comments shows that deregulation was considered the preferable route by almost everybody. With an ever-increasing list of exempt products, it was clearly rational to assign some costs to those exempt products. That DOE soon followed the 1976 amendment with plans to decontrol more products only serves to further justify the decision to readopt the "V" factor.

■ After a careful review of the legislative and regulatory record before the court, without the benefit of any *post hoc*

rationalizations, the court finds that DOE's decision-making path is reasonably discernable. Further, that the agency decision was based on a proper consideration of the EPAA objectives, and that the decision constituted a rational choice from among the alternatives available to the agency.

■ Addressing defendant's final argument, the court finds that the "V" factor does not violate the dollar-for-dollar passthrough requirement of the EPAA, 15 U.S.C. § 753(b)(2)(A). Defendant argues:

"The effect of the amended 'V' factor formula was to assign costs to products on a completely arbitrary basis. Rather than placing a higher percentage of increased crude oil costs on those products that require more costly refinery processing, such as gasoline, the amended 'V' factor arbitrarily assigned a large proportion of these costs to residue products, such as petroleum coke. These products in turn have a relatively low value in the petroleum products market, and the high percentage of costs allocated to them under the amended 'V' factor could not be recovered. Thus, the amended 'V' factor did not provide refiners a 'reasonable mechanism' for achieving a dollar-for-dollar passthrough of increased costs."

Def's. Reply to Pltf's. Mem. p. 15.

Defendant asserts that costs proportionally allocable to exempt products could not be recovered in the marketplace. For the purposes of summary judgment, the court will assume this is true. Nonetheless, the Act does not require that DOE guarantee the effectiveness of its passthrough option, only that it be a "reasonable mechanism." *Exxon Corp. v. FEA,* 398 F.Supp. 865, 875 (D.D.C.), *aff'd sub nom. Texaco, Inc. v. FEA,* 531 F.2d 1071 (TECA, 1975), *cert. denied,* 426 U.S. 983 (1976). *Accord, Cities Service Co. v. FEA,* 529 F.2d 1016, 1024 (TECA, 1975), *cert. denied,* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976) ("the Act merely mandates that an opportunity for the passthrough of costs be provided"). The challenged regulations do not restrict the passthrough of increased costs; rather, they allow unrestricted passthrough, sub-

ject only to market conditions. The court finds this sufficient.

Moreover, as noted above, Congress was well aware of DOE's volumetric allocation scheme when it enacted the EPCA, which retained the dollar-for-dollar passthrough provision while requiring volumetric allocation for certain products. Thus, it appears that Congress did not consider volumetric allocation as violative of the passthrough provision.

### D. *Retroactive Recalculation.*

The final question is whether Murphy should be allowed to retroactively reallocate its costs for the period prior to the promulgation of the 1976 amendment, now that TECA has held invalid the 1974 amendment.

Murphy makes two major arguments. The first is that the *Mobil* decisions are applicable to Murphy, and not limited to Mobil alone. It is clear that *Mobil* is applicable to Murphy in the sense that DOE could not now enforce the 1974 amendment against Murphy, or that Naph-Sol cannot sue for any over-recoveries which may have resulted from Murphy's improper application of the rule; that is, the rule cannot be enforced against Murphy. But, that does not address the issue here and is not dispositive.

The issue here is whether Murphy can now retroactively reallocate to products sold to Naph-Sol, costs which were volumetrically allocable to exempt products under the 1974 amendment, thus eliminating any over-recoveries which may have resulted from sales to Naph-Sol. Murphy's second argument more closely addresses this issue. Murphy relies on *Mamula v. United States,* 346 F.2d 1016 (9th Cir.1965) for the argument that it can now refigure its cost scheme, and in so refiguring, can allocate more costs to the products it sold to Naph-Sol. *Mamula* was a tax case in which the Ninth Circuit upheld the taxpayer's right to select the more economically advantageous of two methods of determining his tax liability, where he had initially reported his income incorrectly, and where "[a]t the in-

sistence of the government, not the taxpayer, the prior calculations which adopted the improper method [were] set aside, and new calculations, of *necessity* [had to] be undertaken." *Id.* at 1019 (emphasis in original). The opinion stresses the government's role in requiring recalculation. *Mamula* is therefore clearly distinguishable; no government action is involved here, and no recalculation is *necessary.*

The two cases relied on by plaintiff are equally distinguishable. Both *Tenneco Oil Co.,* 1 DOE ¶ 85,512 (1977), and *Eastern Airlines, Inc. v. Atlantic Richfield Co.,* No. 74–1207 Civ-JM (S.D.Fla. mem. dec., Jan. 12, 1982), involved situations where the sellers chose the amount of costs to assign to particular products, and then later sought to reallocate costs to eliminate over-recoveries. Here, an invalid regulation, rather than a decision by Murphy, limited the costs which were assigned to the particular products. Therefore, the present situation presents a much closer question. After careful consideration, the court adopts the *Tenneco* and *Eastern Airline* analysis that retroactive recalculation should not be allowed to offset overcharges which have arisen as a result of unrelated regulatory violations. This analysis is supported by the Ninth Circuit's reliance on the necessity of recalculations in *Mamula.* The general rule counsels against unnecessary retroactive recalculation, *see, e.g., Mamula; Pacific National Co. v. Welch,* 304 U.S. 191, 58 S.Ct. 857, 82 L.Ed. 1282 (1934), and none is necessary here. The court finds this rule even more persuasive in view of Murphy's desire to legitimate over-recoveries by recalculating costs.

### E. *Summary.*

Having fully considered the arguments of counsel, the applicable statutes and legislative histories, the 1974 and 1976 amendments regarding both notice and final promulgation, and the TECA analysis in the *Mobil* decisions, the court finds that the 1976 amendment met the procedural requirements of both the APA and the EPAA, and was not arbitrary or capricious.

Further, that Murphy is not allowed to retroactively refigure its cost structure for the period covered by the 1974 amendment. Defendant's second motion for partial summary judgment on Count III is denied, and the motion for summary judgment on Count IV is held in abeyance.

### V.

### MOTIONS TO DISMISS COUNTS VII AND VIII

Defendant has moved for dismissal of Count VII, arguing that it is a pure contract count and is barred by the applicable statute of limitations. Defendant has also moved for dismissal of Count VIII, arguing that it is simply an allegation of bad faith, which apart from a specific breach of contract fails to state a claim upon which relief can be granted. Plaintiff concedes that Count VIII is contractual in nature and virtually identical to the breach of contract action in Count VII. "Rather than dismiss Count VIII, however, Naph-Sol urges the Court to combine Count VII and Count VIII for purposes of trial and allow Naph-Sol to proffer evidence of Murphy's bad faith in breaching the Supply Contracts with Naph-Sol." For the purpose of defendant's motions to dismiss, the court accepts plaintiff's suggestion to consider Counts VII and VIII as one.

When a motion to dismiss is brought, the court is called on to determine if the plaintiff's pleadings set forth allegations sufficient to make out the elements of a right to relief. "[W]ell pleaded facts are taken as true, and the complaint is construed liberally in favor of the party opposing the motion." *Davis H. Elliot Co. v. Caribbean Utilities Co., Ltd.,* 513 F.2d 1176, 1182 (6th Cir.1975). *See also, Hospital Building Co. v. Rex Hospital Trustees,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78

S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1956). However, mere conclusions will not save a complaint from dismissal. *See, Blackburn v. Fisk University,* 443 F.2d 121, 125 (6th Cir.1971).

"[I]t is uniformly held that the defense of limitations may be raised by a Rule 12 motions to dismiss when, as here, the time alleged in the complaint shows that the action was not brought within the statutory period."

*Rauch v. Day & Night Manufacturing Corp.,* 576 F.2d 697 (6th Cir.1978).

Plaintiff's seventh count is a breach of contract claim. It states in relevant part:

"69. Murphy's action in charging Naph-Sol prices for the Petroleum Products on or immediately prior to May 15, 1973 which exceeded the maximums prescribed by the Supply Contracts, as described in paragraph 13, *supra, constituted a breach of the Supply Contracts.*

70. As a direct and foreseeable result of Murphy's *breach of contract,* Naph-Sol has suffered *consequential damages* as a result of the fact that Murphy subsequently determined its selling prices to Naph-Sol by applying prices charged to Naph-Sol on or immediately prior to May 15, 1973 which were higher than those which would have been applied had Murphy not breached the Supply Contract."

Complaint, ¶¶ 69, 70 (emphasis added).

Defendant has moved for dismissal citing Michigan's four-year statute of limitations, under M.C.L.A. § 440.2725; M.S.A. § 19.-2725, the UCC section dealing with contracts for the sale of goods. Plaintiff concedes the applicability of the four-year statute, but argues for the first time in its memorandum in opposition to dismissal, that each sale of product constituted a separate breach of the contracts and that recovery can still be had for those breaches which occurred within the last four years prior to the date of filing of this action.

The emphasized portions of the complaint, as quoted above, allege a single breach with consequential damages resulting from each sale. If there was only a single breach, any action is now time-

barred. A breach of contract is not a continuing wrong under Michigan law. As the Court of Appeals for the Sixth Circuit stated in *Proctor & Schwartz, Inc. v. U.S. Equipment Co.,* 624 F.2d 771, 773 n. 3 (6th Cir.1980), "Michigan courts have found certain acts, such as trespass and nuisance, were continuing wrongs, but we find no authority for treating a breach of contract in the same manner." *See also Brown v. International Union, U.A.W.,* 85 F.R.D. 328, 338 (W.D.Mich.1980); *Cushman v. Avis,* 28 Mich.App. 370; 184 N.W.2d 294 (1970).

Plaintiff mounts a rather weak attack on the motion to dismiss, alleging,

"that each time it purchased product from Murphy after March 31, 1973, Murphy exceeded the contract price and thereby breached its contractual obligations. Consequently, each purchase by Naph-Sol and each corresponding breach of contract by Murphy created a separate cause of action. *Kenworth Sales Co. v. Salantino,* [154 Wash. 236] 281 P. 996, 998 (1929); *Krebs Hop Co. v. Livesley,* 59 Or. 574, 114 P. 944 (1911); 1 C.J.S. Action § 103(b)(1)."

Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss Count VII, p. 2. This analysis, however, simply does not agree with the clear and simple statements in the complaint.[9]

Plaintiff also cites *U.S. Oil Co. v. Koch Refining Co.,* 497 F.Supp. 1125, 1131 (E.D. Wis.1980), an analogous case under the Mandatory Price Regulations, wherein the court noted:

"As plaintiff has correctly stated, each purchase and concurrent alleged overcharge created a separate cause of action. Thus, plaintiff is entitled to sue for recovery of overcharges dating back six years from the filing of this action." (Citations omitted.)

However, *U.S. Oil Co.* involved statutory overcharges, not a breach of contract, and is inapposite.

█ The court finds that plaintiff has alleged only a single breach in 1973, and that any action to recover on the contract is time-barred. Counts VII and VIII are, therefore, dismissed.[10]

## VI.

### PLAINTIFF'S JURY DEMAND

Defendant has moved to strike plaintiff's jury demand on the grounds that no right to a jury trial exists on claims brought pursuant to section 210(b) of the Economic Stabilization Act. It is the decision of this court that defendant's motion to strike plaintiff's jury demand shall be held in abeyance pending a status conference with the parties. A status conference will be held in chambers within ten days of the filing of this opinion.

### ON MOTION FOR SUMMARY JUDGMENT

Presently before the court is defendant's motion for summary judgment on plaintiff's fourth cause of action. The court held this motion in abeyance when it issued its earlier opinion on defendant's various motions. Following a status conference at which the importance and applicability of the deemed recovery rule were clarified, the court is now prepared to address defendant's motion.

Plaintiff seeks to apply the equal application and deemed recovery rules to Murphy in support of its claims for overcharges in the fourth cause of action. Plaintiff claims that:

---

**9.** In addition to alleging only a single breach, plaintiff fails to allege a continuing contract which was still enforceable in the four years preceding the filing of this action. While such failure is not fatal to the count, it appears to the court that multiple, independent breaches require such a continuing contract. It would be helpful to the court if plaintiff indicated how long the contract continued.

**10.** This dismissal is without prejudice and plaintiff is free to amend the complaint to allege multiple, independent breaches. However, in view of the court's finding that the contract was not breached, *see* discussion of defendant's motion for summary judgment on Count I, such amendment may be a futile gesture.

"52. During each month of the period relevant to this complaint, Murphy has applied a lesser proportion of its increased costs to its own employee-operated "Spur" retail outlets than it has applied in determining its selling prices to Naph-Sol.

53. During each month of the period relevant to this complaint, Murphy has applied a greater proportion of its increased costs to the class of purchaser in which Naph-Sol properly belongs than it has applied, on a proportionate basis, to other classes of purchaser."

Based on these allegations, plaintiff claims that defendant miscalculated the amount of "banked" costs available for recoupment in each month and improperly computed the maximum allowable prices for covered products sold to plaintiff. Defendant Murphy Oil has moved for summary judgment arguing that the deemed recovery rule is both procedurally and substantively invalid.

## STANDARD FOR SUMMARY JUDGMENT

On a motion for summary judgment, the movant has the burden of showing conclusively that there exists no genuine issue as to material fact and that the moving party is entitled to summary judgment as a matter of law. *Smith v. Hudson,* 600 F.2d 60 (6th Cir.1979); *Tee-Pak, Inc. v. St. Regis Paper Co.,* 491 F.2d 1193 (6th Cir.1974).

In determining whether there are issues of fact requiring a trial, "the inferences to be drawn from the underlying facts contained in [the affidavits, attached exhibits and depositions] must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). *Accord, Bohn Aluminum & Brass Corp. v. Storm King Corp.,* 303 F.2d 425 (6th Cir.1962). Even if the basic facts are not disputed, summary judgment may be inappropriate when contradictory inferences may be drawn from them. *Diebold, supra; EEOC v. United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industry, Local 189,* 427 F.2d 1091, 1093 (6th Cir.1970). In making this determination, the court must make reference to the entire record and all well-pleaded allegations are to be accepted as true. *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389 (6th Cir.1975). These guidelines will be adhered to as substantive issues of the various motions are examined.

## EQUAL APPLICATION

As will be explained more fully below, the deemed recovery rule was adopted as an amendment to the refiner's price rule, 10 C.F.R. § 212.83, on August 30, 1974. 39 Fed.Reg. 32306 (Sept. 5, 1974). Stated simply, the rule required that refiners either pass through equal increments of increased product costs over May 15, 1973, selling prices to all purchasers of a particular product, or charge different increments, but absorb the differences rather than "banking" or carrying over the unrecouped costs. An important preliminary issue, which may affect the procedural validity of the deemed recovery rule, is whether the prior regulations required such "equal application."

The original regulations were adopted by the Cost of Living Council under the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 (note), on August 22, 1973. 6 C.F.R. § 150, Subpart L, 38 Fed.Reg. 22536 (Aug. 22, 1973). These controls placed ceilings on the prices which refiners could charge for covered products. They did not require that the maximum allowable prices be charged, a theme which would carry through the entire regulatory period.

The first suggestion of an equal application requirement appears in the preamble to these original regulations. It states in part:

"Any increase in base prices ... of a product due to increased costs of crude petroleum or increased costs of imports must be applied equally to all classes of purchasers of that product."

38 Fed.Reg. 22536, 22537. The regulations describing allocation of increased crude oil costs for special products (gasoline, # 2 oils) stated:

"[A] refiner may, in computing its base prices for [special products] ... include

317

an amount to reflect increased costs ... which are attributable to that product.... In no case may the ratio that the attributed part bears to the total increased costs ... exceed the ratio which sales during the corresponding fiscal quarter of the preceding year of the particular product receiving this allocation bears to the total sales of covered products during the same quarter."

Sections 150.356(f), 150.357(d). 38 Fed.Reg. at 22540, 22541. For covered products other than special products (also referred to herein as nonspecial products) the rules stated:

"[A] refiner may, in computing its base prices for [nonspecial products] ... include an amount to reflect increased costs ... which are attributable to all of its covered products. To the extent that a refiner does not allocate increased costs ... pursuant to this paragraph, it may include that part of its increased costs ... attributable to [special products] in computing its base prices for those products...."

Sections 150.356(e), 150.357(c). 38 Fed.Reg. at 22540, 22541.

Both section 150.356 (allocation of increased costs of imported crude oil) and section 150.357 (allocation of increased costs of domestic crude oil) concluded with the requirement that "[t]he amount of increased costs ... included in computing ... base prices of a particular product must be equally applied to each class of purchasers of that product."

The basic refiner's price rule stated:

"A refiner may not charge a price for an item in excess of the base price of that item except [prenotified, nonproduct cost increases]."

Section 150.358(b), 38 Fed.Reg. at 22541.

In its memorandum in support of its motion for summary judgment, defendant argues that the equal application rule applied only to nonspecial products. This completely ignores the early history of the regulations. The original regulations, as quoted above, clearly require equal application for all products.

On September 12, 1973, the regulations were amended and clarified. 38 Fed.Reg. 25686 (Sept. 14, 1973). At that time a formula was introduced which was to be used to calculate the maximum amount of increased crude oil costs which could be added to the May 15, 1973 selling price of a particular product. Section 150.356(c)(2). The formula yielded a "D" term which was defined as "The dollar increase that can be applied to each May 15, 1973, selling price of the covered product concerned to each class of purchaser to compute ... the ... base price to each class of purchaser." 38 Fed.Reg. at 25688. The same formula and the same "D" term applied to both special products and products other than special products. Section 150.356(c)(1) allowed the carryover of unrecouped costs. Section 150.356(e) stated that refiners could increase prices other than a special product to reflect increased crude oil costs, "provided that the amount of increased costs included in computing base prices of a particular covered product other than a special product must be equally applied to each class of purchaser." The explicit equal application requirement no longer included special products.

On October 31, 1973, further amendments were promulgated. 38 Fed.Reg. 30267 (Nov. 2, 1973). These retained the single formula scheme with an express equal application requirement for computing base prices of nonspecial products only. Compare § 150.356(c)(i) with § 150.356(c)(ii). A new section 150.356(d) was introduced containing banking provisions. This section expressly required equal application of banked costs to each class of purchaser of nonspecial products in computing base prices.

For special products the carryover provision stated

"If ... a firm charges prices for a special product ... which result in the recoupment of less total revenues than the entire amount of increased costs of ... crude petroleum calculated for that product ... the amount of increased costs not

recouped may be added to the May 15, 1973, selling prices to compute the base prices for that special product . . . for a subsequent month."

Section 150.356(d)(i).

On November 30, 1973, 38 Fed.Reg. 33577 (Dec. 6, 1973), the rules were significantly amended with the introduction of two general allocation formulas, one for the special products, the other for nonspecial. Section 150.356(c)(2). The general formula for special products established "the dollar increase that may be applied . . . to the May 15, 1973 selling price of the special product . . . of the type 'i' to each class of purchaser to compute the base price to each class of purchaser." This amount is designated in the formula as "$d_i{}^u$". This formula is almost identical to the former single formula adopted in September, 1973. *Compare* "D" at 38 Fed.Reg. 30270 *with* "$d_i{}^u$" at 38 Fed. Reg. 33580.

The requirement of equal application in computing base prices for nonspecial products again appeared at section 150.-356(c)(1)(ii).

"In computing base prices for a covered product other than a special product, a refiner may increase its May 15, 1973 selling price to each class of purchaser . . . by an amount to reflect the increased product costs attributable to sales of covered products other than special products . . . provided that the amount of increased product costs included in computing base prices of a particular covered product other than a special product must be equally applied to each class of purchaser."

Similarly, section 150.356(d)(2) required equal application of banked costs when used to compute base prices of nonspecial products. *Cf.* § 150.356(d)(1) (no express equal application requirement when applying banked costs to special products).

On December 27, 1973, the regulations were repromulgated by reference in 10 C.F.R. § 201. 39 Fed.Reg. 744 (Jan. 2, 1974). On January 14, 1974, the regulations were republished in full at 10 C.F.R. § 212. 39 Fed.Reg. 1924 (Jan. 15, 1974). More specifically, 6 C.F.R. § 150.356 became 10 C.F.R. § 212.83. The relevant regulations remained unchanged from those promulgated on October 30, 1973, and quoted above. These were also the regulations as they existed immediately prior to the adoption of the deemed recovery rule.

The regulations clearly required equal application of increased nonproduct costs for both special and nonspecial products. 10 C.F.R. §§ 212.83(c)(2)(i)(b), (ii)(b), 39 Fed. Reg. at 1953. At issue is whether these regulations required equal application of increased product costs even if a refiner chose to sell product at less than the maximum allowable price.

All of the regulations quoted above refer to the equal application rule in terms of computing *base prices*. The August 17, 1973, regulations defined "base price" for a particular product as "the weighted average price at which that item was lawfully priced in transactions on May 15, 1973 . . . plus increased costs of [crude oil] . . . ." Section 150.358(g).

Defendant attacks the equal application rule by arguing that it applies only when establishing a "base price" which defendant argues is the single maximum allowable price for a particular product. Therefore, defendant argues there is no equal application requirement if a refiner sells product at prices below the maximum allowed.

Defendant, however, is in the somewhat difficult position of arguing that the "base price" is a single maximum lawful price at which covered products could be sold, (Def's. Mem. in Support of Motion, at page 18) and was also a flexible number whereby "a refiner had discretion to establish a *base price* that included only a portion of [the maximum increment of increased product cost that could be added to the weighted average May 15, 1973, price]." (Emphasis added.) *Id.* at 22.

The distinction is critical. Since all of the regulations addressing equal application address it only in terms of computing a base price, if the base price is a fixed maximum number, then *arguably* (as defendant sug-

gests), the rule applies only at maximum allowable prices. Conversely, if the "base price" is that price which the refiner determines by deciding how much increased costs to allocate to a product, then the rule applies to the process of establishing the "base price" even if the refiner sets a base price less than the maximum allowable amount.

The court notes the apparent difficulty in deciding whether prices below the maximum are "base prices." *See Standard Oil Co. v. DOE*, 596 F.2d 1029, 1040–1045 (TECA, 1978) and defendant's allegations set out above concerning refiners' discretion to establish base prices. In addition, the court notes a recent decision in *Mobil Oil v. DOE*, 547 F.Supp. 1246, No. 79–CV–11 (N.D.N.Y. Sept. 21, 1982). At page 1266, the district judge states that "the rule refers only to the computation of base prices, not to the computation of actual selling prices below base prices." Two sentences later he states:

> "In this regard, the Temporary Emergency Court of Appeals [TECA] has indicated that under the base price rules, a refiner was not required to add all increased product costs arrived at under the general formula in determining base prices; *that a refiner could vary its base prices* according to the amount of increased product costs applied to May 15, 1973 selling prices; and that the sum represented by adding all increased product costs calculated under the formula to the May 15, 1973 selling price was the maximum base price, *rather than the only base price. See Standard Oil Co. v. DOE* [supra]."

In *Standard Oil, supra,* TECA was called on to decide whether the "base price" for special products was a single maximum amount. At issue was a regulation which required that all product cost increases (PCIs) be passed through before non-product cost increases (NPCIs). Since unrecouped NPCIs could not be banked, some refiners were passing through NPCIs first, and banking PCIs which could not be passed through. DOE promulgated the challenged regulation without notice and comment. DOE argued that the base price was a single identifiable number arrived at by adding the "$d_i^u$" term for a given month and product, to the May 15, 1973, selling price, and that NPCIs could only be passed through after the PCIs established by the $d_i^u$ term had been figured into the base price. The lower court held that the base price for special products was flexible; that refiners had discretion to use less than the maximum allowable costs in establishing base prices, to which it could then add its NPCIs. 453 F.Supp. 203 (N.D.Ohio, 1978).

On appeal, TECA held the promulgation invalid because "a 'fixed' base price interpretation [of the prior regulations] was not compelled." 596 F.2d at 1045. The fixed base price interpretation not being compelled, notice and comment were necessary prior to amending the regulations. The argument is even less compelling for nonspecial products, where the $D_i^u$ term is significantly more amorphous. After reviewing defendant's analysis and the TECA decision in *Standard Oil,* the court finds that it agrees with defendant's characterization of prices below the maximum allowable price as "base prices." Therefore, the equal application rule applied whenever a refiner determined its base price, whether or not it was the maximum allowable base price.

One final issue concerning the equal application rule; does it apply to special as well as nonspecial products? Defendant contends that the equal application rule applies only to nonspecial products, and is necessary only because the "$D_i^u$" term for nonspecial products simply defines a lump sum dollar amount which may be apportioned to nonspecial products. The court finds this analysis unsupportable since the rule preceded the appearance of the separate "$d_i^u$" term which can be added to each class of purchaser is a single, fixed increment. This is exactly the argument the Northern District of Ohio rejected, but which TECA did not reach, in *Standard Oil v. DOE, supra.* This court agrees, the base price for special products is not fixed, and therefore does not of itself require equal application.

In determining the applicability of the equal application rule to special products, the court turns to the early history of the regulations. When the original CLC regulations were promulgated in August, 1973, they explicitly required equal application for both special and nonspecial products. Sections 150.356(e), 150.357(c), 38 Fed.Reg. at 22450, 22451. The express equal application requirement was deleted when the regulations were amended on September 12, 1973. Since the "D" term in the formula which was introduced in the September promulgation, does not require equal application (*see* discussion at 453 F.Supp. at 224–226), there is no equal application requirement. It appears that the equal application requirement for special products was simply deleted.

The court thus finds that the equal application rule applied to special products prior to September 12, 1973, and applied to nonspecial products at least up until September, 1974. Further, the rule applied at maximum prices and in determining base prices below the maximum.

## DEEMED RECOVERY RULE

It was against this regulatory background that the deemed recovery rule was promulgated. It was promulgated without notice and an opportunity to comment on August 30, 1974. 39 Fed.Reg. 32306 (Sept. 5, 1974). The agency did not label the promulgation interpretive, but chose instead to waive the notice and comment requirement based on exigent circumstances. The notice of promulgation reflected the agency's interpretation of prior regulations as requiring equal application of increased product costs at less than maximum allowable base price. The statement also noted the changing market conditions had highlighted an ambiguity in the regulations.

"In general, these regulations have resulted in the equal application of increased product costs among classes of purchaser. An ambiguity in the regulations, however, is that sellers are not specifically required actually to charge the prices arrived at under the regulations.

As an improved supply situation has begun to have a restraining influence on prices, the [agency] has become aware that certain sellers have taken the position that they may selectively 'bank' increased product costs as to certain classes of purchaser, for recoupment in a subsequent month, as long as the prices charged to other classes of purchaser do not exceed the maximum lawful price. Such practices could obviously serve to avoid the intent of the overall framework of the price regulations, and the [agency] is undertaking to insure that these pricing practices are not put into effect."

*Id.* at 32307. The deemed recovery rule was intended

"to clarify and make explicit the requirement that prices charged for each covered product must reflect the equal application of increased product costs to each class of purchaser, and that failure to charge prices that reflect equal application of increased product costs except to the extent the seller is precluded from charging such prices by the price term of a contract ... will result in unrecouped increased product costs which the seller will not be permitted to recover in a subsequent month. . . .

At the same time, the FEA has concluded that its regulations should be clarified in this regard, so that all sellers will be expressly on notice that prices actually charged, and not merely prices calculated as a lawful maximum, must reflect the equal application of increased product costs, except where a pre-existing contract prevents the implementation of such a price."

*Id.*

The amendment itself actually operated on the banking provisions of section 212.-83(d), by

"amending ... regulations providing for the carryover of unrecouped increased product costs by a seller. Thus, for each product the recoupment of increased product costs will be calculated on the assumption that the largest amount of increased product cost added to the May

15, 1973 selling price and included in the price charged to any class of purchaser, was equally applied to the price charged to all class of purchaser, without regard to whether such prices were, in fact, charged."

*Id.* The amendment did not affect a refiner's ability to charge less than the maximum allowable base price. It merely limited the ability to *selectively* apply higher increased costs to some purchasers, while banking unrecouped costs not passed through to other purchasers.

The notice of promulgation also discussed the contract exception, which allowed recovery of unrecouped increased product costs which did not reflect equal application, where the seller's recovery was limited by a pre-existing contract. This situation was one aspect of the agency's finding of an emergency.

"The [agency] has concluded that these amendments must be made effective on September 1, 1974, prior to opportunity for comment, upon a finding that an emergency exists. It has only recently come to [the agency's] attention that certain sellers have implemented and continue to implement prices which do not conform to the [agency] concept of preserving May 15, 1973 price differentials among various classes of purchaser. To the extent that there is ambiguity in the current regulations, compliance efforts as to such sellers are more difficult. And, as the supply situation becomes more favorable, the incentive to depart from the equal application requirement becomes stronger. Moreover, announcement of these amendments as proposals would highlight current ambiguities in the regulations and could result in sellers seeking to take advantage of that ambiguity or of the contract exception to the regulation. The [agency] has determined that the continuation of initiation of such practices would be injurious to the public welfare, in view of the number of circumventions of [agency] regulations and the substantial compliance difficulties which would result."
*Id.*

The notice closed by noting that the agency was preparing further proposed revisions to the price regulations, and that public hearings would be held within the month on those revisions, at which time the agency would take comments on the deemed recovery rule.

In moving for summary judgment on plaintiff's fourth cause of action, defendant Murphy Oil challenges plaintiff's right to recover alleged overcharges on the grounds that the deemed recovery rule was procedurally and substantively invalid. For the reasons that follow, I find that the deemed recovery rule was invalidly promulgated. Therefore, it will be unnecessary to address defendant's substantive challenge to the deemed recovery rule.

### ADMINISTRATIVE PROCEDURE

Both the rulemaking provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.,* and the Federal Energy Administration Act (FEAA), 15 U.S.C. § 761 *et seq.,* applied to the Federal Energy Administration's (FEA) September 5, 1974, rule promulgation. *See, Mobil Oil Corporation v. Department of Energy,* 547 F.Supp. 1246, (N.D.N.Y.1982); *Lakes Gas Co. v. Department of Energy,* 477 F.Supp. 187, 189 (D.Minn.1979). The APA provides that notice of a proposed rule be published in the Federal Register and that interested persons be given the opportunity to comment on the proposed rule. 5 U.S.C. § 553(c). The APA further requires that a proposed rule be published 30 days before its effective date. 5 U.S.C. § 553(d). The FEAA requires that any proposed rule be published ten days in advance of a rule's effective date to provide interested parties the opportunity to comment on the proposed rule. 15 U.S.C. § 766(i)(1)(B).

Under the APA and the FEAA, notice and comment requirements can be waived under narrow exceptions. *See, New Jersey v. Environmental Protection Agency,* 626 F.2d 1038, 1045 (D.C.Cir.1980); *Shell Oil Co.*

*v. Federal Energy Administration,* 574 F.2d 512 (TECA, 1978). Under the APA, an agency is permitted to promulgate a regulation without prior notice and opportunity for comment where the agency, for good cause, finds the procedure to be impracticable, unnecessary, or contrary to the public interest, 5 U.S.C. § 553(b)(B). Under the more stringent requirements of the FEAA, notice and comment procedures could be waived only if compliance with formal rulemaking procedures would result in serious harm or injury to the public welfare, 15, U.S.C. § 766(i)(1)(B) *redesignated,* Department of Energy Organization Act (1977), 42 U.S.C. § 7191(e).

Notice and comment procedures were applicable to the September 5 rule promulgation. Under the FEAA, notice and comment procedures were required where an agency promulgation was likely to have a substantial impact on the nation's economy or large numbers of individuals or businesses, 15 U.S.C. § 766(i)(1)(C). This requirement applied not only to rules and regulations but also to orders similar to rules or regulations. Conference Report No. 93–788, 93rd Cong., 2d Sess. reprinted in (1974) U.S.Code Cong. & Ad.News, pp. 2939, 2977.

■ Although the APA generally exempts agencies from notice and comment procedures when promulgating interpretative rules, 5 U.S.C. § 553(b)(3)(A), agencies are not exempt from notice and comment procedures where notice and comment procedures are required by statute. 5 U.S.C. § 553(b). Thus, since the FEAA statutorily required notice and comment procedures to be followed in promulgating orders that were similar to regulation, the deemed recovery rule was subject to formal rulemaking procedures of the APA and the FEAA regardless of whether or not the deemed recovery rule was an interpretative ruling of a prior regulation or a new rule. *See Lakes Gas Co., supra,* at 190.

Since the deemed recovery rule was subject to notice and comment requirements, the FEA's waiver of formal rulemaking procedures can only be justified by compelling circumstances. *Mobil Oil Corp. v. De-*

*partment of Energy,* 610 F.2d 796 (TECA, 1979); *Nader v. Sawhill,* 514 F.2d 1064 (TECA, 1975). In the present case, FEA waived notice and comment because it stated that compliance with formal rulemaking procedures would be injurious to the public welfare. 39 Fed.Reg. 32307 (Sept. 5, 1974). FEA's assertion that an emergency existed was based on FEA's finding that due to an ambiguity in the regulations, certain sellers had taken the position that they could selectively "bank" increased product costs as to certain classes of purchaser for recoupment in a subsequent month against other classes of purchaser. *Id.*

■ FEA feared that this practice, which was permitted where a seller was bound by contractual arrangements, *see,* FEO Ruling 1974–12, 39 Fed.Reg. 18423 (May 20, 1974), would become widespread if the agency complied with formal rulemaking procedures. FEA believed that publication of the proposed rule would have alerted sellers to the ambiguity in the regulations and invited sellers to evade the effect of the future rule by entering into long term contracts during the rulemaking period. This practice, allegedly, would have resulted in discriminatory pricing against independents and various geographic regions. Under these circumstances, FEA believed that an emergency existed which permitted the waiver of formal rulemaking procedures. I disagree.

As noted earlier, exceptions to the notice and comment provisions are to be used "very sparingly," Conf. Report *supra* at 2977. Case law establishes that noncompliance with rulemaking procedures is to be tolerated only in "calamitous circumstances." *Nader v. Sawhill, supra,* at 1069. Waiver of notice and comment procedures is only permitted where there is an immediate need for a regulation to avoid severe economic consequences. *Shell Oil Corp. v. Federal Energy Administration, supra; Tasty Baking Co. v. Cost of Living Council,* 529 F.2d 1005 (TECA, 1975); *California v. Simon,* 504 F.2d 430 (TECA, 1974).

Both *Nader v. Sawhill, supra,* and *Shell Oil, supra,* are instructive in determining

when notice and comment procedures may be waived. In *Nader,* TECA upheld an immediate price increase of $1 per barrel on "old" crude oil. The increase, which was promulgated without notice and comment was upheld on the grounds that an immediate need for crude oil was needed due to the Arab oil embargo. TECA specifically stated that its holding was limited to the unique circumstances of that case. *Nader, supra* at 1069. In *Shell Oil,* TECA held that notice and comment could not be waived to issue ceiling price regulations on unleaded gasoline despite the fact that the need for unleaded gasoline was immediate and the only alternative was to put unregulated fuel on the market.

In the present case, there were no compelling circumstances surrounding the discriminatory pricing practices cited by the agency, or discernible to this court, to justify waiver of formal rulemaking procedures. In September of 1974, there was no apparent disruption of petroleum supplies or distribution which created an immediate threat to the public. *Cf. Nader, supra* (disruption of supply). Indeed, the agency itself, in its September 5 promulgation, stated that petroleum supplies were increasing. 39 Fed.Reg. 32308. Furthermore, had FEA complied with notice and comment procedures, sellers would only have had ten days in which to enter long-term contracts to avoid the effects of the deemed recovery rule. 15 U.S.C. § 766(i)(1)(B). It is highly unlikely that enough long-term contracts could have been entered into in that brief period which would have created a severe economic impact on the national economy. Such a determination would be highly speculative. Thus, the court concludes that the perceived emergency did not rise to the level of "calamitous circumstances" which would justify the waiver of formal rulemaking procedures. As a result, I find the September 5, 1974, promulgation of the deemed recovery rule to be procedurally invalid. Therefore, plaintiff is not entitled to recover alleged overcharges based on defendant's breach of the deemed recovery rule.

## SUBSEQUENT PROCEEDINGS

Plaintiff and DOE both argue that even if the September 5th promulgation was procedurally invalid, any procedural infirmities were cured by the September 6, 1974, notice of proposed rulemaking, 39 Fed.Reg. 32718 (Sept. 10, 1974), the comment period which followed, and subsequent republication of the equal application rule on November 29, 1974. 39 Fed.Reg. 42368 (Dec. 5, 1974). The agency closed its September 5th rulemaking by stating:

> "The FEA will, however, receive public comment on the amendments issued today. The FEA is preparing further proposed revisions to the price regulations. Public hearings respecting the proposed revisions and the amendments issued today are anticipated in September. The FEA will solicit written and oral comments during these proceedings, notice of which will appear in the FEDERAL REGISTER in the near future."

*Id.* at 32307. The September 10th notice of proposed rulemaking followed. In its notice, the agency discussed several aspects of the rule which were undergoing administrative review, *e.g.,* regional pricing differentials and inflexibility which was at odds with certain EPAA mandates. The discussion concluded by stating, at page 32723:

> "However, to the extent that the current [equal application] requirement serves to protect the independent sector of the market, FEA has concluded that it must be retained. Accordingly, the FEA proposes to amend the equal application requirement so that different amounts of increased product costs may be added to the prices charged to different classes of purchaser of a product, provided that the amount added to the prices charged to any class of purchaser that includes independent marketers cannot be greater than the amount added to the prices charged to any other class of purchaser of the same product, except to the extent that a refiner is selling to a particular purchaser at a lower price under a pre-existing written contract.

Comments are specifically requested as to whether this provision will adequately protect the independent sector of the market, or whether other restrictions on the application of increased product costs are required and, if so, what they should be."

Numerous other amendments to the regulatory scheme were also proposed in the September 10 notice.

On November 1, 1974, one of the unrelated proposed amendments was adopted. 39 Fed.Reg. 39259 (Nov. 6, 1974). In its notice of promulgation the agency stated, "Action on all other revisions to the price regulations proposed in the September 10 notice is deferred until a later date. However, those possible revisions continue to be under active consideration by [the agency] for decision in this proceeding." *Id.* No mention was made of the equal application or deemed recovery rules.

A second aspect of the September 10th proposal was promulgated on November 29, 1974. 39 Fed.Reg. 42368 (Dec. 5, 1974). This promulgation deleted the pre-notification procedures for nonproduct cost increases, redefined nonproduct costs, and defined refinery fuel as a nonproduct cost. The preamble to the promulgation contained a provision almost identical to the one quoted above from the November 1st promulgation. No mention was made of the equal application or deemed recovery rules, although they were republished.

The procedural validity of this process is almost identical to the question this court addressed in upholding the validity of the 1976 amendment to the "V" factor in its opinion of September 17, 1982. The two issues are whether the later notice and comment process was sufficient, and whether the later promulgation was an effective promulgation of the challenged rule. The court found the 1976 "V" factor amendment valid because the notice was sufficient to make interested parties aware of the proposed regulation and its ramifications. Although the present situation is very similar, the court finds it unnecessary to ad-

dress the notice issue since it finds the promulgation itself invalid.

As stated in the court's earlier opinion: "[t]his argument is based on . . . the failure to discuss the issue in the 'general statement of . . . basis and purpose,' required by 5 U.S.C. § 533(c). . . . As stated in *Rodway* [*v. United States Department of Agriculture,* 514 F.2d 809, 817 (D.C.Cir.1975) ]:

'The basis and purpose statement is *not intended to be an abstract explanation addressed to imaginary complaints.* Rather, *its purpose is,* at least in part, *to respond* in a reasoned manner *to the comments received, to explain* how the agency resolved any significant *problems raised by the comments,* and to show how that resolution led the agency to the ultimate rule.' (Emphasis added.)

. . . .

Moreover, agencies need not reply to each comment received.

'[I]t should be obvious that the Secretary need not answer each of the thousands of comments he received over a two-year period. See *Automotive Parts & Accessories Assn. v. Boyd,* 407 P. 330, 338 (D.D.Cir.1968). Nor does every nonfrivolous 'substantive' inquiry merit a head-on response in the agency's general statement under 5 U.S.C. § 533(c). Instead, the Secretary is obligated to identify and comment on only major issues raised during the proceeding which are central to his exercise or regulatory discretion. Judgments as to what issues are vital and material also are susceptible to review under the arbitrary and capricious standard. *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 35 (D.C.Cir.), *cert. denied,* 434 U.S. 829 [98 S.Ct. 111, 54 L.Ed.2d 89] (1977).' "

▮ In its earlier opinion, the court found that the challenged issue did not rise to the status of a major issue requiring agency comment in the basis and purpose statement. The present situation is easily distinguished. The administrative record

and DOE's analysis in its Amicus Memorandum, clearly demonstrate that the impact of the equal application and deemed recovery rules, especially on the independent segment of the industry, was a major issue in the public comment process. Accordingly, the agency's decision to promulgate the rule (or to repromulgate it without amendment) had to be supported by a statement "explain[ing] how the agency resolved any significant problems raised by the comments," for it to be a procedurally valid promulgation. *Rodway, supra.* The November 1, 1974, promulgation neither mentioned nor published the deemed recovery rule. The November 29, 1974, promulgation republished the rule, but provided no introductory remarks concerning its decision to retain it. Therefore, the rule was not properly promulgated.

Plaintiff suggests that several other republications were sufficient to validly promulgate the rule. The court finds these republications suffering from the same fatal lack of a basis and purpose statement.

Later promulgations did not cure the procedural invalidity of the original promulgation of the deemed recovery rule.

## CONCLUSION

In summary the court finds the equal application rule applied to the establishment of base prices, whether at or below the maximum allowable base price for nonspecial products. It did not apply to special products after September 13, 1973.

The promulgation of the deemed recovery rule required full notice and comment procedures. The promulgation was therefore deficient and the rule invalid. Later agency actions did not cure these procedural defects.